## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

Plaintiff,

v.                                                    CASE NO.:

META PLATFORMS, INC., INSTAGRAM, LLC,

Defendants.
_____/

## **COMPLAINT**

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General"), sues META PLATFORMS, INC. ("Meta Platforms") and INSTAGRAM, LLC ("Instagram") (collectively "Defendants" or "Meta"), and alleges the following:

### I.      INTRODUCTION

1.      For many years, Defendants have misrepresented and continue to misrepresent that their social media platforms[1] are a safe place for inspiration and expression.

_____

[1] Defendants' social media platforms are Facebook and Instagram and are hereinafter "Social Media Platforms" or "Platforms."

2.     Far from being a safe place, Defendants' Platforms cause serious harm to children, parents, and the community at large by deploying algorithms and other features designed to hijack the attention of its users, barrage them with advertisements, and relentlessly mine their interactions for monetizable data. These features designed to maximize user engagement are particularly harmful to young users.

3.     The U.S. Surgeon General's ("Surgeon General") recent Advisory calls attention to an urgent public health issue stemming from excessive and problematic social media use and the growing concern regarding its effects on youth mental health.[2] In an interview with CNN, the Surgeon General explained that he believes it is not fair to expect children to know how to resist the lure of social media: "You have some of the best designers and product developers in the world who have designed these products to make sure people are maximizing the amount of time they spend on these platforms. And if we tell a child, use the force of your willpower to control how much time you're spending, you're pitting a child against the world's greatest product designers."[3]

---

[2]  Health and Human Services, The U.S. Surgeon General's Advisory, Social Media and Youth Mental Health (2023).
[3] Allison Gordon and Pamela Brown, *Surgeon General Says 13 is 'Too Early' to Join Social Media*, CNN (Oct. 18, 2023), https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html.

4.     Although Meta uses features to attract young users across its Platforms, it primarily uses its Instagram Platform to engage young users. Meta is incentivized to maximize children's time on Instagram in order to bombard Florida children with advertisements that generate revenue for Meta.

5.     Many Florida parents are involved in a desperate struggle to overcome the consequences of Meta's impact on their children. Yet, Meta consistently represents that its services are safe and provides children with an easy on-ramp to its Platforms that parents are unable to effectively monitor and control.

6.     In various court filings, Florida families have alleged health issues and harms to children such as anxiety, depression, self-harm, suicide, and eating disorders stemming from social media use. In one court filing, parents of a young Florida teen allege that "[s]oon after starting to use Instagram, she was hooked; her use spiraled out of her control, injuring her self-image and self-esteem by a harmful barrage of images and videos." These images "promoted unrealistic body images and crushing dietary restrictions" and at thirteen the teen was "diagnosed by her physician with anorexia and a host of associated mental and physical symptoms. She continues to struggle with these conditions today."[4]

---

[4] *Dayna Page et al. v. Meta Platforms Inc., and Instagram LLC*, No. 4:22-cv-06124-YGR, Complaint, *4 (N.D. Cal., filed October 17, 2022).

7.     Florida school districts are also confronting the dire consequences of Meta's deceptive and unfair practices. The overwhelming mental health needs of students, caused by oversaturation of social media, have forced schools to respond. Many Florida school districts have brought their own claims against Meta, universally citing a correlation between growing social media use and a decline in students' mental, emotional, and social health.

8.     Broward County School District is one of the largest in the United States and the second largest school district in the State of Florida, serving over a quarter of a million students enrolled in over three hundred schools. According to the Broward County School District's lawsuit against Meta, "[t]here has been a surge in the proportion of youth in plaintiff's community who say they cannot stop or control their anxiety, who feel so sad and hopeless that they stop doing the activities that they used to love, who are considering suicide, who made plans to commit suicide, and who have attempted to commit suicide."[5]

9.     Meta's scheme to exploit young users for profit involves several components: (1) through its development of its Social Media Platforms, Meta created a business model focused on maximizing young users' time and attention spent on its Platforms to attract advertisers and increase revenue; (2) Meta designs

---

[5] *Broward County School Board v. Meta Platforms, Inc.*, No. 4:23-cv-01061, Amended Complaint, *32-33 (N.D. Cal, filed March 23, 2023).

manipulative Social Media Platform features that prompt young users' compulsive and extended platform use; and (3) Meta falsely assures the public that its features are safe and suitable for young users.

10.    The Attorney General is filing this action to stop Meta's deceptive and unfair conduct and to obtain injunctive relief and recover civil penalties through the Attorney General's statutory enforcement authority under federal and state law.

## II. PARTIES

11.    Plaintiff, The Attorney General, is an enforcing authority for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes (2023), and is afforded the authority to seek the full range of relief available under FDUTPA. The Attorney General is also authorized by the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. 91 *et seq*., to bring an action to enforce COPPA's provisions. 15 U.S.C. § 6504(1).

12.    Pursuant to 15 U.S.C § 6504(a)(2), the Plaintiff notified the Federal Trade Commission of this action.

13.    Defendant Meta Platforms is a Delaware corporation with its principal place of business in Menlo Park, California. As relevant here, Meta, through itself or its subsidiaries, develops, markets, and operates Instagram and Facebook.

14.    Meta transacts or has transacted business throughout Florida and the United States. At all times material to this Complaint, Meta has advertised, marketed,

5

and distributed the Meta platforms to consumers in Florida and throughout the United States.

15.     Defendant Instagram offers a mobile application that enables users to share content such as photographs and videos online and over social networks. Instagram is a limited liability company incorporated in Delaware with its principal place of business in Menlo Park, California. Instagram is a wholly owned subsidiary of Meta Platforms.

16.     As detailed in the allegations below, Meta Platforms is engaging, has engaged, and continues to engage in unfair, deceptive, and unlawful activity in this State. Meta Platforms has conducted this activity on its own and through its Defendant subsidiary.

### III. JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction of the claims in this Complaint pursuant to 28 U.S.C. § 1331 because they involve questions of federal law arising under the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. § 6501 *et seq.*, 16 C.F.R. §§ 312.4, 312.5, 312.9. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the state law claims because all claims alleged herein form part of the same case or controversy. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391 because it is a district in which a substantial part of the events or omissions giving rise to the claim occurred.

18.     This Court has personal jurisdiction over Meta pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure because Meta is subject to the jurisdiction of Florida courts under § 48.193(1)(a), Fla. Stat. (2023). Meta markets its services to users throughout Florida, makes payments to content creators located in Florida, makes payments to advertisers in Florida, directs marketing efforts towards Floridians, and intentionally avails itself to the Florida market to render the exercise of jurisdiction over Meta consistent with traditional notions of fair play and substantial justice. One of Meta's subsidiaries, Meta Payments, Inc., is incorporated in Florida and Meta maintains and operates a data center in Miami, Florida.

19.     The Attorney General investigated the matters alleged herein and determined that this enforcement action serves the public interest.

20.     All conditions precedent to this action have been performed or have occurred.

## IV. BACKGROUND FACTS

21.     Meta develops, owns, operates, and controls several Social Media Platforms and services, including Facebook and Instagram. Instagram's platform is frequented by young users, including children in Florida and the United States.

22.     Facebook was founded in February 2004 and its growth was maintained by a series of acquisitions as more Social Media Platforms began to emerge in the market. Facebook's strategy was to purchase new platforms that threatened its

market share of young users and integrate the social mechanics of the new platforms into Facebook's products.[6]

23.     Facebook purchased Instagram on April 9, 2012, reportedly for $1 billion.[7] Upon information and belief, Instagram's rapid success due to its popularity with young users was the driving factor in its acquisition. Instagram grew to over 600 million users by the end of 2016.[8]

24.     By 2018, Instagram had revenues surpassing $10 billion, and by 2021 its revenues grew to over $45 billion. Instagram was recently valued at over $100 billion. An estimated 72 percent of teens in the United States regularly use Instagram.[9]

25.     In October 2021, Facebook rebranded its company to Meta, signaling its intent to offer a variety of social media services besides its flagship Facebook

---

[6] Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, *Investigation of Competition in Digital Market* (Mark Zuckerberg emails to David Ebersman February 28, 2012 and to unknown recipient April 9, 2012), (2020).
[7] Meta Newsroom, *Facebook to Acquire Instagram*, Meta (April 9, 2012), https://about.fb.com/news/2012/04/facebook-to-acquire-instagram/#:~:text=MENLO%20PARK%2C%20CALIF.,cash%20and%20shares%20of%20Facebook.
[8] Instagram Blog, *600 Million Instagrammers and Counting*, Meta (Dec. 21, 2016), https://about.instagram.com/blog/announcements/600-million-instagrammers-and-counting.
[9] Katherine Schaeffer, *7 facts about Americans and Instagram*, Pew Research Center (Oct. 7, 2021), https://www.pewresearch.org/short-reads/2021/10/07/7-facts-about-americans-and-instagram/.

platform.[10] Upon information and belief, Meta was valued at over $500 billion as of March 2023 and continues to dominate the social media market.

## V. DEFENDANTS' SCHEME TO EXPLOIT YOUNG USERS FOR PROFIT

26.     Meta seeks to attract young people because they (1) are more likely to be influenced by advertisements, (2) become lifelong customers, and (3) set trends that the rest of society emulates. To draw young people into its ecosystem and keep them coming back, Meta employs technologies designed to maximize their time on and engagement with its Social Media Platforms.

27.     Meta exploits young users of its Platforms by deploying technology to create features that draw the attention of youth and sustain their engagement or time spent on its platforms so that it can sell more advertising opportunities to paying advertisers. Upon information and belief, when Meta succeeds in maintaining a user's interest through its algorithms, Meta is able to both collect more data and serve more targeted advertisements to the user.

### A. Meta's Products Induce Young Users' Harmful, Compulsive and Extended Use

#### 1. Infinite Scroll and Auto-Play Features

28.     One feature that Meta uses to capture young users' attention is the infinite scroll ("Infinite Scroll") design on its user interface. Infinite Scroll is

---

[10] Meta Newsroom, *Introducing Meta: A Social Technology Company*, Meta (Oct. 28, 2021), https://about.fb.com/news/2021/10/facebook-company-is-now-meta/.

characterized by the partial display of additional information at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation (without seeing the top portion of the next post in their feed).

29.    The previewing of new material continues indefinitely as the user scrolls down the feed.

30.    The Infinite Scroll format makes it difficult for young users to disengage, because there is no natural end point for the display of new information.

31.    Instead, the Platform displays new information that has yet to be viewed, causing young users to worry about "missing out" (this phenomenon is called "Fear of Missing Out", or "FOMO").

32.    Meta also deploys the "Autoplay" feature to keep young users on Instagram and other Social Media Platforms by continuously showing videos.

**2. Likes and Social Comparison**

33.     Meta's Social Media Platforms encourage social comparison, such as likes ("Likes"), a quick way for users to select other users' photos and express validation or approval.

34.    Meta has elected to retain the Like feature despite concern regarding its impact on young users.

### 3. Ephemeral Content Format

35.    In 2016, Instagram introduced the stories surface ("Stories"), which was a copycat of Snapchat stories, allowing the user to post ephemeral photo and video slideshows that disappear within 24 hours.[11]

36.    Instagram Stories are shown at the top of the user's feed and because these videos are only available for a short period of time, users are incentivized to use the Instagram platform at least once per day. Children are conditioned to frequently open Meta's Social Media Platform so they will not experience Fear of Missing Out.

37.    Another example is the live feature ("Live") on the Platforms which gives users the ability to livestream videos to followers.[12] The videos released through Live are only available in real-time. If a young user doesn't quickly join the live stream, the user will miss out on the chance to view the entire video unless the content creator re-uploads the entire video, which Meta does not allow the creator to edit and all likes, comments, and view counts are erased from the original, live video.[13]

---

[11] Josh Constine, *Instagram launches "Stories," a Snapchatty feature for imperfect sharing*, TechCrunch (Oct. 12, 2023), https://techcrunch.com/2016/08/02/instagram-stories/.

[12] Instagram Help Center, *Live*, Meta (last accessed  Oct. 18, 2023), https://help.instagram.com/272122157758915/?helpref=hc_fnav.

[13] Instagram Help Center, *Notification Settings*, Meta (last accessed Oct. 18, 2023), https://help.instagram.com/105448789880240.

**B. Meta's Platform Features are Designed to Induce Young Users' Harmful, Compulsive and Extended Use**

38.     Despite Meta's assurances to parents, lawmakers, and users that its Social Media Platforms are suitable for young users and designed to promote their well-being, it continues to develop and implement features that induce young users' harmful, extended and compulsive social media use.

39.     On numerous occasions, Meta has communicated that its features are not harmful and not designed to induce young users' addictive or compulsive social media use.

40.     In 2019, Adam Mosseri, Instagram Executive, told CBS that the well-being of its users is a top priority.[14]

41.     In 2021, Antigone Davis ("Davis"), Vice President, Meta Global Head of Safety, testified to Congress, "[w]e have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17."[15]

---

[14] CBS Morning News, *Instagram is seriously considering hiding likes, app's head reveals, CBS News* (Oct. 18, 2023), https://www.cbsnews.com/video/instagram-is-seriously-considering-hiding-likes-appshead-reveals/.

[15] *Protecting Kids Online: Facebook, Instagram, And Mental Health Harm: Hearing Before The Subcomm. On Consumer Protection, Product Safety, And Data Security Of The Comm. On Commerce, Science, And Transportation United States Senate*, 117 Cong. 10 (2021) (Statement of Antigone Davis, VP Global Head of Safety, Facebook).

42.     Meta's leadership claims "… we don't allow young people to see certain types of content and have age-gating around certain types of content."[16] Davis also testified: "[w]hen it comes to those between 13 and 17, we consult with experts to ensure that our policies properly account for their presence, for example, by age-gating around certain types of content."[17]

43.     In 2021, Davis testified that Meta "made changes to our news feed to allow for more meaningful interactions, knowing that that would impact the time spent" and that Meta did this "because we were trying to build a positive, more positive experience…"[18]

44.     However, Meta has designed its Platforms to exploit the teenage brain's susceptibility to the addictive features of its Platforms.

## 1.  Meta Deceptively Denies that its Products are Addictive

45.     Meta employs design features that work to override young users' attempts to disengage from Meta's Social Media Platforms. These tactics are wholly

---

[16] *Protecting Kids Online: Facebook, Instagram, And Mental Health Harm: Hearing Before The Subcommittee On Consumer Protection, Product Safety, And Data Security Of The Committee On Commerce, Science, And Transportation United States Senate*, 117 Cong. 35 (2021) (Statement of Antigone Davis, VP Global Head of Safety, Facebook).

[17] *Protecting Kids Online: Facebook, Instagram, and Mental Health Harm: Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Data Security of the H. Comm. on Commerce, Science, and Transportation*, 117th Cong. 35 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

[18] *Protecting Kids Online: Facebook, Instagram, and Mental Health Harm: Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Data Security of the H. Comm. on Commerce, Science, and Transportation*, 117th Cong. 39 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

within Meta's control and Meta makes it difficult for young users to stop using Meta's products, independent of the content with which the users interact. Meta has long denied that its Social Media Platforms are designed to be addictive. In 2018, Facebook told the BBC that "at no stage does wanting something to be addictive factor into" the design process for its products.[19]

46.     In 2021, Davis testified before Congress that Meta does not build its products to be addictive; further, she disputed the addictive nature of Meta's products.[20]

47.     During a congressional hearing in March 2021, Mark Zuckerberg ("Zuckerberg"), Meta's Founder, Executive Chairman, and Chief Executive Officer, stated "what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do…."[21]

---

[19] Hilary Andersson, *Social media apps are 'deliberately' addictive to users*, BBC (July 4, 2018), https://www.bbc.com/news/technology-44640959.

[20] *Protecting Kids Online: Facebook, Instagram, And Mental Health Harm: Hearing Before The Subcommittee On Consumer Protection, Product Safety, And Data Security Of The Committee On Commerce, Science, And Transportation United States Senate*, 117th Cong. 38 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

[21] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. On Commc'n and Technology and the Subcomm. On Consumer Protection and Commerce of the House Committee On Energy and Commerce*, 117th Cong. 100 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

48.    Zuckerberg played up the benefits of Meta's platforms to the committee, stating that "overall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely."[22]

49.    Meta's features contribute to the amount of time teens spend on Meta's Social Media Platforms, such as Instagram.

50.    Meta designs its products with the goal of consuming as much of the user's time as possible. In a 2017 interview, Sean Parker, a former president of Facebook, asks "how do we consume as much of your time and conscious attention as possible? That means that we need to [give a] sort-of dopamine hit once in a while because someone liked or commented on a photo or a post. . .that's gonna get you to contribute more content, and that's gonna get you . . . more likes and comments."[23]

---

[22] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 56 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

[23]  Erica Pandey and Sean Parker, *Facebook was designed to exploit human "vulnerability"*, Axios (Nov. 9, 2017), https://www.axios.com/2017/12/15/sean-parker-facebook-was-designed-to-exploit-human-vulnerability-1513306782 at 00:14.

51.     Mr. Parker further states in his interview that the creators of Meta's products, including Facebook and Instagram, knew of the addictive nature of these platforms yet "did it anyway."[24]

52.     Meta launched "Daily Limit," to enable users to limit the amount of time they spend on Instagram daily. Despite the feature's name, it does not enable users to restrict the amount of time they spend on the app.[25]

53.     In December 2021, the day before Instagram Executive Adam Mosseri was scheduled to appear before Congress, and shortly after a whistleblower highlighted Meta's impact on the well-being of teens onto the national stage, Instagram launched the "Take a Break" tool.[26] Take a Break sends users a pop-up notification when they have spent more than a specified period of uninterrupted scrolling time.

54.     Meta's so-called "time-management" tools cannot effectively counteract the overwhelming power of features like Infinite Scroll, Autoplay, and other use-inducing features.

---

[24] Erica Pandey and Sean Parker, *Facebook was designed to exploit human "vulnerability"*, Axios (Nov. 9, 2017), https://www.axios.com/2017/12/15/sean-parker-facebook-was-designed-to-exploit-human-vulnerability-1513306782 at 00:55.
[25] Instagram Help Center, *Set a Daily Limit on Instagram*, Meta (last accessed Oct. 20, 2023 at 11:16am), https://help.instagram.com/2049425491975359/?cms_platform=iphone-app&helpref=platform_switcher.
[26] Adam Mosseri, *Raising the Standard for Protecting Teens and Supporting Parents Online*, Instagram (Dec. 7, 2021), https://about.instagram.com/blog/announcements/raising-the-standard-for-protecting-teens-and-supporting-parents-online.

## 2. Meta Prioritizes Engagement Over Well-being

55.     In October 2021, and in response to a 60 Minutes report critiquing Meta's products, Meta made the following public statement: "protecting our community is more important than maximizing our profits."[27]

56.     Upon information and belief, Meta has misrepresented its purported prioritization of teen well-being and safety over profits and fails to disclose the serious risks its features pose to young users' mental health.

57.     Upon information and belief, Meta has deceptively claimed for years that its top priority is the well-being of users, and that its Social Media Platforms are safe and age-appropriate platforms for young users.

### i.    Meta's Deception Relating to Young Users' Body Dysmorphia and Eating Disorders

58.     Upon information and belief, Meta also deceives the public by representing in its public communications that its Social Media Platforms do not allow content that promotes or encourages eating disorders, all while actively choosing to retain platform features known by Meta to promote those very problems, despite expert warnings about the resulting harms to young users.

---

[27] Clare Duffy, *Facebook whistleblower revealed on '60 Minutes,' says the company prioritized profit over public good*, CNN (Oct. 4, 2021), https://www.cnn.com/2021/10/03/tech/facebook-whistleblower-60-minutes/index.html.

59.     Upon information and belief, the compulsive use of Meta's platforms by young users promotes unhealthy body expectations. For example, one Florida youth alleges in a court filing that "[s]hortly after registering to use Meta platforms(s) at the age of thirteen, Plaintiff began engaging in addictive and problematic use of the platform(s)." She subsequently developed anorexia after she was repeatedly shown harmful content after being subjected to "the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform pushed …24 hours a day."[28]

### ii.   Meta's Deceptive Statements on the Incidence of User Harms

60.     Meta has publicly represented that the prevalence statistics in the Community Standard Enforcement Reports ("CSER") are a reliable measure of the safety of its Social Media Platforms—even going so far as to assert that the CSER prevalence numbers were the internet's equivalent of scientific measurements utilized by environmental regulators to assess the levels of harmful pollutants in the air.

61.     For example, in a May 2019 post on its website entitled "Measuring Prevalence of Violating Content on Facebook," Meta stated the following:

> One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence. . . . We care most about how often content that violates our standards is actually seen relative to the total amount of times any content is seen on Facebook. This is similar to measuring

---

[28] *Brooke Downing v. Meta Platforms, Inc., et. al.*, No. 8:22-cv-01977-VMC-AAS, Amended Complaint, *21 (M.D. Fla., filed Aug. 17, 2022).

concentration of pollutants in the air we breathe. When measuring air quality, environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people. Prevalence is the internet's equivalent — a measurement of what percent of times someone sees something that is harmful.[29]

62.     Zuckerberg has stated to Congress that Meta's prevalence numbers serve as a model for companies' transparency efforts.[30]

63.     Upon information and belief, Meta regularly publishes the CSER which deceptively boasts very low rates of violations of its community standards. The CSER, published quarterly, describes the percentage of content posted on Instagram that Meta removes for violating Instagram's community standards. Meta often refers to that percentage as its prevalence metric.[31]

64.     However, despite Meta's claims that it promotes safety and effectively prevents harmful content from reaching its users, young users have suffered and continue to suffer mental health and other consequences as a result of their compulsive and extended use of the Platforms which are designed to lure in the users and make it difficult for them to disengage.

---

[29] Meta News, *Measuring Prevalence of Violating Content on Facebook* (May 23, 2019), https://about.fb.com/news/2019/05/measuring-prevalence/.
[30] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 49 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).
[31] Meta Transparency Center, *Prevalence*, Meta (Nov. 18, 2022), https://transparency.fb.com/policies/improving/prevalence-metric/.

## C. Meta's Ineffective Age Gating Practices are Unfair and Deceptive

65.    Meta claims that it effectively monitors its Platforms for underage users but in reality, Meta does not use effective age gating procedures on its Platforms. In fact, it was only in response to pressure from regulators and the public that Meta purported to implement an age gate as part their Platforms' account registration process.

66.    Upon information and belief, this age-gate is ineffective because it does not prevent under-13 users from creating and using social media accounts.  Meta's Platforms have a significant number of users who self-report as under the age of 13.[32]

67.    Meta admits to wanting to appeal to young users. For example, in September 2021, in a statement in response to a news article regarding underage users on Instagram, Meta claimed that "[l]ike all technology companies, of course we want to appeal to the next generation, but that's entirely different from the false assertion that we knowingly attempt to recruit people who aren't old enough to use our apps."[33]

---

[32] Katherine Schaeffer, *7 facts about Americans and Instagram*, Pew Research Center (Oct. 7, 2021), https://www.pewresearch.org/short-reads/2021/10/07/7-facts-about-americans-and-instagram/.
[33] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show*, WSJ (Sept. 28, 2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667.

68.     Meta is aware that underage users are creating accounts on its Platforms but fails to acknowledge the extent of their presence or implement effective procedures to prevent their access.  Meta claims "we know that young people can lie about their date of birth. We want to do more to stop this from happening. . ."[34]

69.     If an underage account is reported to Meta, Meta claims that "we will delete the account if we can't verify the account is managed by someone over 13 years old."[35] Zuckerberg told Congress, "if we detect that someone might be under the age of 13, even if they lied, we kick them off."[36]

70.     While testifying before Congress in 2021, Meta's Global Head of Safety Antigone Davis stated: "if we see someone trying to, repeatedly, change their [birth] date to get past that [age screen], we actually will restrict their ability to access the app."[37]

---

[34] Instagram Blog, *Continuing to Make Instagram Safer for the Youngest Members of Our Community*, Meta (March 17, 2021), https://about.instagram.com/blog/announcements/continuing-to-make-instagram-safer-for-the-youngest-members-of-our-community.

[35] Instagram Help Center, *Underage Children*, Meta (last accessed Oct. 18, 2023), https://www.facebook.com/help/instagram/290666591035380.

[36] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 76 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

[37] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcommittee On Communications and Technology and the Subcommittee On Consumer Protection and Commerce of the House Committee On Energy and Commerce*, 117 Cong. 15 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

71.     Despite its awareness that underage users are attempting to access and gaining access to their Platforms, Meta consistently fails to acknowledge their presence and has not employed effective age-gating to prevent their access—to do so would impact Meta's appeal to advertisers seeking to reach young users and would require Meta to institute more effective procedures to protect the data of children, including providing notice to parents and obtaining parental consent to collect data from under-13 users prior to the collection and use of the protected data.

72.     Based on information and belief, in many instances children have been able to maintain accounts on Meta's Platforms, accounts that provide data to advertisers relating to these young users despite Meta's claims that it will delete or block underage accounts.

## D. Health Effects on Young Users of Meta's Platforms

73.     Heavy consumption of social media is associated with diminished mental health outcomes.[38] For example, hours spent on social media and the internet are more strongly associated with poor psychological health, such as self-harm behaviors, depressive symptoms, low life satisfaction and low self-esteem.[39]

---

[38] Jean Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence From Three Datasets*, Psych. Q. 90, 311 (2019).
[39] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations With Mental Health Vary By Activity And Gender*, 56 Soc. Psych. and Psych. Epidemiology 2017 (2021).

74.     Girls who use social media for 5+ hours per day are many times more likely to have clinically relevant symptoms of depression than non-users.[40] Research indicates heavy use of social media during developmental windows, like puberty, leads to lower life satisfaction ratings.[41]

75.     Even more concerning, social media use interferes with sleep. Heavier social media use was associated with poorer sleep patterns (e.g., later sleep and wake times on school days and trouble falling back asleep after nighttime awakening) and poorer sleep quality.[42] Adolescents who use social media for 5+ hours per day are three times more likely than non-users to not obtain adequate sleep.[43]

76.     For adolescents who are highly engaged social media users, even strict parental rules about social media use before bed does not result in better sleep quality and outcomes.[44]

---

[40] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations With Mental Health Vary By Activity And Gender*, 56 Soc. Psych. and Psych. Epidemiology 2017 (2021).
[41] Amy Orben et al., *Windows of Developmental Sensitivity to Social Media, 13 Nature Communications* (2022), https://www.nature.com/articles/s41467-022-29296-3.pdf.
[42] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings From the UK Millennium Cohort Study*, 9 BMJ Open 1 (2019); *see also* Garrett Hisler et al., *Associations Between Screen Time and Short Sleep Duration Among Adolescents Varies By Media Type: Evidence From A Cohort Study*, 66 Sleep Medicine 99, 92-102 (2020).
[43] Hugues Sampasa-Kanyinga et al., *Use of Social Media is Associated With Short Sleep Duration In a Dose-Response Manner in Students Aged 11 To 20 Years*, 107 Acta Paediatrica 694, 694-700 (2018); *see also* Marian Freedman et al., *Social media and sleep duration-there is a connection!*, 35 Contemporary PEDS Journal 5 (2018).
[44] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescents' Sleep: A Longitudinal Study on the Protective Role of Parental Rules Regarding Internet Use Before Sleep*, 18 Intl. J., Environ. Res. Pub. Health 1346 (2021).

77.     Additionally, young people can be particularly attuned to FOMO and may feel an extra need to be connected at night and to check social media. Unsurprisingly, many teens frequently wake up at night specifically to check social-media notifications.[45]

78.     Researchers have identified a positive feedback loop: those who use social media habitually are less able to regulate their behavior.[46]

### VI. META'S COPPA NONCOMPLIANCE

79.     The Children's Online Privacy Protection Act ("COPPA") protects the privacy of children by requiring technology companies like Meta to provide notice to and obtain authorization from parents prior to collecting the personal information of their children online.

### A. Meta's Legal Obligations Under COPPA With Respect to Instagram and Facebook

80.     COPPA prohibits social media companies from collecting a child's personal information without first obtaining verifiable parental consent if the data is collected by "an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1).

---

[45] Anushree Tandron et al., *Sleepless Due to Social Media? Investigating Problematic Sleep Due to Social Media and Social Media Sleep Hygiene*, 113 Comps. in Human Behavior 106487 (2020).
[46] Maria T. Maza *et al.*, *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, JAMA Pediatrics (2023).

81.     Meta is also required to provide "notice on the website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information . . ." 15 U.S.C. § 6502(b)(A)(i).

82.     The term "child" is defined by 15 U.S.C. § 6501(1) "to mean an individual under the age of 13."

83.     The term "Verifiable Parental Consent" means:

> any reasonable effort (taking into consideration available technology), including a request for authorization for future collection, use, and disclosure described in the notice, to ensure that a parent of a child receives notice of the operator's personal information collection, use, and disclosure practices, and authorizes the collection, use, and disclosure, as applicable, of personal information and the subsequent use of the at information before that information is collected from that child.

15 U.S.C. § 6501(9).

84.     COPPA empowers State Attorneys General to bring suit against companies that violate COPPA and permits State Attorneys General to obtain injunctive relief, damages, restitution, and other relief on behalf of residents of the State. 15 U.S.C. § 6504.

85.     COPPA also requires the Federal Trade Commission ("FTC") to promulgate regulations consistent with the statute's regulations and the FTC has promulgated such regulations. 15 U.S.C. § 6502(b); *see* 16 C.F.R. § 312.2 *et seq*.

**B. Meta Possesses "Actual Knowledge" of Children on its Platforms and Collects Their Personal Information Without Obtaining Parental Consent.**

86.     Meta is subject to COPPA's Verifiable Parental Consent requirement because it collects the personal information of under-13 users on its Platforms and, upon information and belief, has actual knowledge that it is collecting personal information of specific under-13 user accounts.

87.     As described in Section V(C), *supra*, Meta strives to attract underage users to its Platforms and, based on information and belief, Meta possesses actual knowledge that a significant number of its users are under the age of 13.[47]

88.     Further, based on information and belief, Meta has collected data from specific children known by Meta to be under age 13.

**C. Meta's Platforms are "Directed to Children."**

89.     Meta is also subject to COPPA's Verifiable Parental Consent requirement because its Platforms, or a portion thereof, are targeted to children. *See* 15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.2.

90.     The FTC has promulgated regulations implementing Section 6502(b) of COPPA, including 16 C.F.R. § 312.2, which defines "directed to children" and sets forth factors for determining whether an online service, or a part thereof, is

---

[47] Katherine Schaeffer, *7 facts about Americans and Instagram*, Pew Research Center (Oct. 7, 2021), https://www.pewresearch.org/short-reads/2021/10/07/7-facts-about-americans-and-instagram/.

directed to children (and therefore subject to the statute's "verifiable parental consent" requirement). 16 C.F.R. § 312.2 provides in relevant part as follows:

> Website or online service directed to children means a commercial Website or online service, or portion thereof, that is targeted to children.
>
> (1) In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.
> …

16 C.F.R. § 312.2.

91.     An online service is "directed to children" if it "targets children as one of its audiences - even if children are not the primary audience." *COPPA July 2020 Guidance* § H(2).[48] Even if a website purports to target teenagers or adults, "in reality, [the] site may attract a substantial number of children under 13, and thus may be considered [to be] . . . 'directed to children' . . . ." *COPPA July 2020 Guidance* § H(2).[49]

---

[48] Federal Trade Commission Resources, *Complying With COPPA: Frequently Asked Questions; A Guide for Business and Parents and Small Entity Compliance Guide*, FTC (July 2020), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.
[49] Federal Trade Commission Resources, *Complying With COPPA: Frequently Asked Questions; A Guide for Business and Parents and Small Entity Compliance Guide*, FTC (July 2020), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.

92.    Under COPPA and applicable regulations, Instagram is "directed to children" because (1) Instagram's "audience composition" includes millions of under-13 users; (2) advertising that promotes Instagram and appears on Instagram is directed to children; (3) Meta's design of the Instagram registration process effectively welcomes children to use Instagram; and, (4) subject matter, characters, activities, music, and other content on Instagram are child-oriented.

93.    Upon information and belief, Instagram's audience composition includes millions of under-13 users. Under 16 C.F.R. § 312.2, empirical evidence regarding audience composition is relevant to determining whether an online service, or a portion thereof, is directed to children.

**1. Advertising that appears on Meta's Platforms is directed to children and is child-orientated**

94.    Under 16 C.F.R. § 312.2, whether "advertising promoting or appearing on . . . the online service is directed to children" is relevant to determining whether an online service, or a portion thereof, is directed to children.

95.    Upon information and belief, Meta has published advertising campaigns featuring individuals who appear to be children or teens.

96.    Upon information and belief, these advertisements and others by Meta were directed at children and teens and featured individuals who appeared to be children or teens.

97.    Under 16 C.F.R. § 312.2, the "age of models, presence of child celebrities, [and] celebrities who appeal to children" is relevant to determining whether an online service, or a portion thereof, is directed to children.

### 2. Subject matter, characters, activities, music, and other content on Meta's Platforms are child oriented

98.    Under 16 C.F.R. § 312.2, "subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content" is relevant to determining whether an online service, or a portion thereof, is directed to children.

99.    For example, according to Meta's Ad Library website, an advertisement promoting the PBS Kids television show "Wild Kratts" and the "PBS KIDS Prime Video Channel" was run on Meta's Social Media Platforms in July 2023.[50]

100.    Upon information and belief, Meta's Platforms publicly hosts accounts and pages on that include child-oriented subject matter.

### D. Meta Does Not Obtain Verifiable Parental Consent Before Collecting Under-13 Users' Personal Information on Meta's Platforms

101.    To obtain verifiable parental consent, Meta must (1) first provide notice to the parent of the company's "personal information collection, use, and disclosure

---

[50] Meta Ad Library (last accessed Oct. 18, 2023),
https://www.facebook.com/ads/library/?active_status=all&ad_type=all&country=US&q=%22pb
s%20kids%22&sort_data[direction]=desc&sort_data[mode]=relevancy_monthly_grouped&searc
h_type=keyword_exact_phrase&media_type=all.

practices," then (2) obtain the parent's authorization for the company to "collect[], use, and disclos[e], as applicable . . . personal information and the subsequent use of that information," all in conformity with the COPPA regulations and all prior to the child's information being collected. 15 U.S.C. § 6501.  Based on information and belief, Meta fails to obtain verified parental consent prior to collecting data of users under age 13.

## VII. META ENGAGES IN TRADE OR COMMERCE THROUGH ADVERTISING

102.   As described in this Complaint, Meta has engaged and continues to engage in conduct that constitutes trade or commerce as those terms are defined in Chapter 501.203(8) as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."

103.  Although users can establish accounts on Meta's Social Media Platforms without paying a fee, Meta does not provide its products for free – rather, it charges its users by collecting their data and time, which Meta then converts into advertising dollars.

104.   To use Meta's Social Media Platforms, a user must first register their account with Meta and create a profile. As a part of this account creation, users agree to enter into a contract with Meta and to comply with Meta's "Terms of Service."[51]

105.   This data is provided to advertisers and governed by Meta's Privacy Policy, which users must agree to in order to have an account. This policy requires that users agree to the collection of user data for advertising purposes.  For example, the Instagram policy states that users' personal information will be used "to select and personalize ads, offers and other sponsored content that we show you. . .  We use the information we have (including your activity off our Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services."[52]

106.   Meta's business model was succinctly summarized by Zuckerberg in his April 2018 Senate Hearing response to a question by Senator Hatch on how

---

[51] Instagram Help Center, *Terms of Use*, Meta (last accessed Oct. 18, 2023), https://www.facebook.com/help/instagram/478745558852511; *See also*, Facebook's Terms of Service, *Terms of Service*, Meta (last accessed Oct. 21, 2023), https://m.facebook.com/legal/terms.
[52] Instagram Help Center, *Data Policy*, Meta (last accessed Oct. 18, 2023), https://help.instagram.com/155833707900388.

Facebook could run a successful business without charging users: "*Senator, we run ads.*"[53] (emphasis added).

107.   This business model creates an incentive, or rather a necessity, for Meta to encourage its users to spend as much time as possible on its Platforms so that it has more data to attract advertisers.

## VIII. CAUSES OF ACTION

### COUNT I

### Violation of the Florida Deceptive and Unfair Trade Practices Act
### (All Defendants)

108.   Plaintiff Attorney General adopts, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

109.   This is an action against all Defendants for violation of FDUTPA.

110.   Defendants' promotion, marketing, and advertising of its products in the State of Florida involves trade or commerce within the meaning of FDUTPA. FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat. (2023).

---

[53] *Facebook, Social Media Privacy, And The Use And Abuse Of Data: Joint Hearing Before The Committee On Commerce, Science, And Transportation United States Senate And The Committee On The Judiciary United States Senate*, 115 Cong. 21 (2018) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

111.   The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat. (2023).

112.   When construing whether acts or practices violate FDUTPA, it is the intent of the Legislature that "due consideration and great weight shall be given to the interpretations [by] the Federal Trade Commission and the federal courts relating to the … Federal Trade Commission Act." § 501.204(2), Fla. Stat. (2023).

113.   Meta engages in unfair practices that offend public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

114.   Meta's unfair acts include but are not limited to Meta's choice to target its Social Media Platforms to children, including Florida children who are under age 13, while knowingly designing its Social Media Platforms to include features known to promote compulsive, prolonged, and unhealthy use by children, and Meta's failure to adopt effective age-gating procedures to prevent access by underage users.

115.   Features employed by Meta's Platforms such as infinite scroll, ephemeral content, autoplay, and disruptive alerts are unfairly used by Defendants

to extract additional time and attention from children whose developing brains were not equipped to resist those manipulative tactics.

116.   Defendants' acts and omissions alleged herein also have caused and continue to cause substantial injury to child users of its Platforms that could not be reasonably avoided by consumers and does not result in any countervailing benefit to consumers or competition.

117.   In connection with the advertising, marketing, and promotion of their products, Defendants made and continue to make deceptive representations to the public that are likely to mislead consumers acting reasonably under the circumstances. These include, but are not limited to, the following deceptive representations by Meta:

A.     Meta's Social Media Platforms are not psychologically or physically harmful for children and are not designed to induce children's compulsive and extended use, when they are so designed;

B.     Meta's Social Media Platforms are not addictive, are not designed to be addictive and less likely to result in psychological and physical harm for children than their Social Media Platforms are in reality;

C.     The Community Standard Enforcement Report indicates that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

D.     Meta prioritizes children's health and safety over maximizing profits, when in fact Meta subordinates children's health and safety to their goal of maximizing profits by prolonging young users' time spend on their Social Media Platforms;

E.     Under-13 users are effectively excluded by Meta from using Instagram and/or Facebook when there are not effective age-gating systems in place;

F.      Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Defendants collected user data; and,

G.      Other false and deceptive representations.

118.    Defendants engage in representations, acts, practices, or omissions which are material, and which are likely to mislead consumers acting reasonably under the circumstances.

119.    Defendants knew or should have known that their conduct was deceptive or prohibited by statute.

120.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of FDUTPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## COUNT II

## VIOLATIONS OF COPPA
### (All Defendants)

121.    Plaintiff realleges and incorporates the paragraphs preceding Count I as though fully alleged in this cause of action.

122.    Defendants have actual knowledge of children under the age of 13 on their Social Media Platforms and direct their Social Media Platforms towards children under the age of 13.

123.    Defendants collect personal information about children under the age of 13 and fail to provide direct notice to the parents about the information they collect

from children, how they use such information, and their disclosure practices in violation of COPPA, 15 U.S.C. § 6502(a); and 16 C.F.R. § 312.4(b)-312.4(c).

124.   Defendants have failed and continue to fail to provide sufficient notice on their Social Media Platforms about the information they collect from children and how they use such information, and their disclosure practices are in violation of COPPA and 16 C.F.R. § 312.4(d).

125.   Defendants have failed and continue to fail to obtain verifiable parental consent prior to collecting or using any personal information of children, in violation of COPPA and 16 C.F.R. § 312.5.

126.   Under 16 C.F.R. § 312.9, a violation of COPPA constitutes an unfair or deceptive practice, in violation of 15 U.S.C. § 45 and FDUTPA.

127.   Florida residents are suffering, have suffered, and will continue to suffer substantial injury resulting from Defendants' violations of COPPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.   Pursuant to §§501.201 *et. seq.*, of FDUTPA and §6502 of COPPA, enter judgment in favor of Plaintiff and against Defendants;

B.   Temporarily and permanently enjoin Defendants to prevent future violations pursuant to § 501. 207(b) of FDUTPA and § 6501(a) of COPPA;

C.   Award civil penalties and attorney's fees for willful violations of FDUTPA pursuant to §§ 501.2075 and 501.2077, Fla. Stat. (2023);

D.   Grant such legal or equitable relief authorized by §§501.201, *et. seq.* of FDUTPA, and §6501(a)(1) of COPPA.

Dated: October 24, 2023

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General of the State of Florida**

John M. Guard
Chief Deputy Attorney General
Florida Bar No. 374600
Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399
John.Guard@myfloridalegal.com

*/s/ Victoria Ann Butler*
Victoria Ann Butler
Director of Consumer Protection Litigation
Florida Bar No. 861250
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Tel.: (813) 287-7950
Victoria.Butler@myfloridalegal.com

Donna Cecilia Valin
Special Counsel, Assistant Attorney General
Florida Bar No. 96687
Office of the Attorney General
Consumer Protection Division
135 West Central Blvd
Orlando, FL 32801
Tel.: (407) 316-4840
Donna.Valin@myfloridalegal.com