Victoria Ann Butler
*pro hac vice*
Director of Consumer Protection Litigation
Florida Bar No. 861250
Office of the Attorney General
Consumer Protection Division
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Tel.: (813) 287-7950
Victoria.Butler@myfloridalegal.com
LEAD COUNSEL FOR THE PLAINTIFF

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

|  |  |
|---|---|
| *Office of the Attorney General, State of Florida, Department of Legal Affairs* | MDL No. 3047 |
| *v.* | Case No. 4:23-cv-05885-YGR |
| *Meta Platforms, Inc., Instagram LLC, and Meta Payments, Inc.* | |
| ----------------------------------------------------- | **PLAINTIFF'S AMENDED COMPLAINT** |
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Judge: Honorable Yvonne Gonzalez Rogers |
| THIS DOCUMENT RELATES TO: 4:23-cv-05885 | |

Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General"), sues META PLATFORMS, INC. ("Meta Platforms"), INSTAGRAM, LLC ("Instagram"), and META PAYMENTS, INC. ("Meta Payments"); (collectively "Defendants" or "Meta"), and alleges the following:

## I.   INTRODUCTION

1.      For many years, Defendants have falsely and deceptively represented and continue to represent that their social media platforms[1] are a safe place for inspiration and expression.

2.      Far from being a safe place, Defendants' Platforms cause serious harm to children, parents, and the community at large by deploying algorithms and other features designed to hijack the attention of its users, barrage them with advertisements, and relentlessly mine their interactions for monetizable data. These features designed to maximize user engagement are particularly harmful to young users.

3.      The U.S. Surgeon General's ("Surgeon General") recent Advisory calls attention to an urgent public health issue stemming from excessive and problematic social media use and the growing concern regarding its effects on youth mental health.[2] In an interview with CNN, the Surgeon General explained that he believes it is not fair to expect children to know how to resist the lure of social media: "You have some of the best designers and product developers in the world who have designed these products to make sure people are maximizing the amount of time they spend on these platforms. And if we tell a child, use the force of your willpower to control how much time you're spending, you're pitting a child against the world's greatest product designers."[3]

4.      Although Meta uses features to attract young users across its Platforms, it primarily uses its Instagram Platform to engage young users. Meta is incentivized to maximize children's time on Instagram in order to bombard Florida children with advertisements that generate revenue for Meta.

---

[1] Defendants' social media platforms are Facebook and Instagram and are hereinafter "Social Media Platforms" or "Platforms."
[2]  Health and Human Services, The U.S. Surgeon General's Advisory, Social Media and Youth Mental Health (2023).
[3] Allison Gordon and Pamela Brown, *Surgeon General Says 13 is 'Too Early' to Join Social Media*, CNN (Oct. 18, 2023), https://www.cnn.com/2023/01/29/health/surgeon-general-social-media/index.html.

5.      Florida parents are involved in a desperate struggle to overcome the consequences of Meta's impact on their children. Yet, Meta consistently represents that its services are safe and provides children with an easy on-ramp to its Platforms that parents are unable to effectively monitor and control.

6.      In various court filings, Florida families have alleged health issues and harm to children such as anxiety, depression, self-harm, suicide, and eating disorders stemming from social media use. In one court filing, parents of a young Florida teen living in Manatee County, Florida,[4] allege about their child that "[s]oon after starting to use Instagram, she was hooked; her use spiraled out of her control, injuring her self-image and self-esteem by a harmful barrage of images and videos." These images "promoted unrealistic body images and crushing dietary restrictions" and at thirteen the teen was "diagnosed by her physician with anorexia and a host of associated mental and physical symptoms. She continues to struggle with these conditions today."[5]

7.      Florida school districts, including some of the largest school districts in the United States, are also confronting the dire consequences of Meta's deceptive and unfair practices and unlawful collection of under-13 users' data. The overwhelming mental health needs of students, caused by oversaturation of social media, have forced schools to respond. Many Florida school districts have brought their own claims against Meta, all citing a correlation between growing social media use and a decline in students' mental, emotional, and social health.

8.      For example, the Hillsborough County School Board has sued Meta to protect its students and their families. Hillsborough County is one of the largest school districts in the United States and the third largest school district in the State of Florida, serving over 224,000 students

---

[4] *Page et al. v. Meta Platforms Inc., and Instagram LLC*, 4:22-cv-06124-YGR, at 4 (N.D.Cal. October 17, 2022); Manatee County, Florida is one of 35 counties located in the Middle District of Florida. https://www.flmd.uscourts.gov/divisions.
[5] *Id.*

enrolled in 313 schools.[6] The School Board of Orange County, Florida also filed suit against Meta, claiming "[t]here has been a surge in the proportion of youth in plaintiff's community who say they cannot stop or control their anxiety, who feel so sad and hopeless that they stop doing the activities that they used to love, who are considering suicide, who made plans to commit suicide, and who have attempted to commit suicide."[7]  Notably, Orange County Schools is the eighth largest public school district in the United States and the fourth largest school district in Florida, serving over 209,000 students in 210 schools.[8] Both Hillsborough County Schools and Orange County Public Schools are located in the Middle District of Florida.

9.      The harm suffered by these students, their families and Florida communities reflect the harm suffered by children in this District and the State of Florida.

10.      Meta's scheme to exploit young users for profit involves several components: (1) through its development of its Social Media Platforms, Meta created a business model that focuses on maximizing young users' time and attention spent on its Platforms to collect data that will attract advertisers and increase revenue; (2) Meta designs manipulative Social Media Platform features that prompt young users' compulsive and extended platform use; and (3) Meta falsely assures the public that its features are safe and suitable for young users.

11.      The Attorney General is filing this action to stop Meta's deceptive, unfair, and unlawful conduct and to obtain injunctive relief and recover civil penalties through the Attorney General's statutory enforcement authority under federal and state law.

---

[6] *IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION,* Case No. 4:22-md-3947, Member Case No.  4:24-cv-01573, at 2 (N.D. Cal. Mar. 14, 2024).
[7] *The School Board of Orange County, Florida v. Meta Platforms, Inc. et al.*, Case No. 23 STCV19344, at 62 (Super. Ct. Cal. Aug. 14, 2023). Orange County, Florida is also one of the 35 counties located in the Middle District of Florida.
[8] About Us, Orange County Public Schools (last accessed April 29, 2024), https://www.ocps.net/about_us.

4

1

## II. PARTIES

2

3

4

5

6

7

8

12.     Plaintiff, the Attorney General, is an enforcing authority for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes (2023), and is afforded the authority to seek the full range of relief available under FDUTPA. The Attorney General is also authorized by the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to bring an action to enforce COPPA's provisions. 15 U.S.C. § 6504 (a)(1).

9

10

13.     The Attorney General investigated the matters alleged herein and determined that this enforcement action serves the public interest.

11

12

13

14

14.     Pursuant to 15 U.S.C. § 6504(a)(2)(A), the Plaintiff notified the Federal Trade Commission of this action and all conditions precedent to this action have been performed or have occurred.

15

16

17

18

19

20

15.     Defendant Meta Platforms is a Delaware corporation with its principal place of business in Menlo Park, California. As relevant here, Meta Platforms formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Amended Complaint and currently operates its business primarily through its subsidiaries including Instagram and Meta Payments.

20

21

22

23

24

16.     Meta Platforms transacts or has transacted business in this District, throughout Florida, and the United States. At all times material to this Amended Complaint, Meta has advertised, marketed, and distributed its Social Media Platforms to consumers in Florida and throughout the United States.

25

26

27

28

17.     Since its inception in 2004 when it was incorporated as Facebook Inc. ("Facebook"), Meta Platforms acquired other platforms such as Instagram in order to dominate the social media market, and has become widely popular throughout this District, Florida, and the United States.

5

Facebook's strategy was to purchase new platforms that threatened its market share of young users and integrate the social mechanics of the new platforms into Facebook's products.[9]

18.     Meta Platforms operated and was known as Facebook until it rebranded its corporate name in 2021 to Meta, which transformed Facebook to the so-called "metaverse," encapsulating its subsidiaries and products into a broader shared network governed by Meta Platforms.

19.     Meta Platforms has continued to dominate the market of social media platforms and applications and has become the largest social media company in the world. Upon information and belief, Meta Platforms has a current value exceeding $500 billion.

20.     Instagram offers a mobile application that enables users to share content such as photographs and videos online and over social networks. Instagram is a limited liability company incorporated in Delaware with its principal place of business in Menlo Park, California and is a wholly owned subsidiary of Meta Platforms after Facebook purchased it in April 2012, reportedly for $1 billion.[10]

21.     Upon information and belief, Instagram's rapid success due to its popularity with young users was the driving factor in its acquisition by Facebook and by the end of 2016, Instagram grew to over 600 million users.[11] For example, in this District alone, a study found that Orlando is the most "Instagrammable" city in Florida, closely followed by Tampa (fourth) and Jacksonville

---

[9] Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, *Investigation of Competition in Digital Market* (Mark Zuckerberg emails to David Ebersman February 28, 2012 and to unknown recipient April 9, 2012), (2020).
[10] Meta Newsroom, *Facebook to Acquire Instagram*, Meta (April 9, 2012), https://about.fb.com/news/2012/04/facebook-to-acquire-instagram/#:~:text=MENLO%20PARK%2C%20CALIF.,cash%20and%20shares%20of%20Facebook.
[11] Instagram Blog, *600 Million Instagrammers and Counting*, Meta (Dec. 21, 2016), https://about.instagram.com/blog/announcements/600-million-instagrammers-and-counting.

(fifth).[12] Orlando has almost 25.5 million hashtags on Instagram, Tampa has almost 11.7 million hashtags on Instagram and Jacksonville has 4.7 million hashtags on Instagram.

22.     Defendant Meta Payments is a wholly owned subsidiary of Meta Platforms and has been incorporated in Florida since December 2010. Meta Payments manages, secures, and processes payments made through Meta. Meta's financial connection to its users, including advertising, is made through Meta Payments. Meta Payments is also licensed as a money service business in Florida, license #FT230000066, registered with the Florida Office of Financial Regulation.[13]

23.     In Florida, Meta maintains a Miami office and advertises job openings for positions based in Miami, Florida. For example, in a recent posting, Meta advertised for a Miami-based Strategic Partner Manager, Payment Partnerships (Business Development & Partnerships) and a Payment Partnerships Manager, Financial Services (Business Development & Partnerships).[14] Meta's Associate General Counsel is also located in Miami, Florida.[15]

24.     As detailed in the allegations below, Meta is engaging, has engaged, and continues to engage in unfair, deceptive, and unlawful activity in this District and throughout the State of Florida. Meta Platforms has conducted this activity on its own and through its Defendant subsidiaries including Instagram and Meta Payments.

25.     Meta operates as a common enterprise. Meta employees use shared email systems and Meta's internal divisions or teams work collaboratively to govern Meta's day-to-day operations. All Meta Defendants share corporate headquarters and senior executives, including

---

[12] Samantha Neely, *Which Instagram Hashtags are most popular for Florida? See the list* (Oct. 20, 2023) https://www.news-press.com/story/news/2023/10/20/florida-instagram-orlando-miami-melbourne-gainesville-naples-hashtags-most-popular-theme-parks/71242425007/.
[13] https://m.facebook.com/payments_terms/licenses.
[14] Job Posting for Strategic Partner Manager, Payment Partnerships, https://www.metacareers.com/jobs/436565892127023/ (last accessed April 29, 2024).
[15] *Tim Gallivan, Associate General Counsel Meta*, LinkedIn (last accessed April 29, 2024), https://www.linkedin.com/in/tim-gallivan-422274138

Mark Zuckerberg ("Zuckerberg"), Meta's Founder, Executive Chairman, and Chief Executive Officer, exercise control over important policy and staffing decisions related to Meta.

26.     Meta holds itself out as a common enterprise. Meta reports revenue and expenses for its entire "family of products."[16] Instagram's Terms of Use identifies "The Instagram Service" as one of the products "provided by Meta Platforms, Inc."[17] As mentioned above, Meta Payments is a common enterprise within the Meta family of products as it is the licensed money transmitter for Meta and allows its users to send money virtually over its Platforms.

27.     Meta represents that it is a common enterprise in the corporate biographies of its executives. For example, Stephane Kasriel, the President and CEO of Meta Payments, is identified as the "Head of Commerce and Financial Technologies at Meta" who "oversees all commerce and fintech work across Meta's technologies and platforms.[18]  The Head of Instagram, Adam Mosseri is identified as having "been at Meta" for more than 11 years.[19]

28.     Since Meta operates as a common enterprise, each Defendant is jointly and severally liable.

**III. JURISDICTION AND VENUE**

29.     This Court has subject matter jurisdiction of the claims in this Amended Complaint pursuant to 28 U.S.C. § 1331 because they involve questions of federal law arising under the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. § 6501 *et seq*., 16 C.F.R. §§ 312.4, 312.5, and 312.9. This Court has supplemental subject matter jurisdiction over the state law claims because all claims alleged herein form part of the same case or controversy. 28 U.S.C. § 1367(a).

---

[16] Meta Platforms, Inc. Form 10-Q, 1, 4, 33, (Q2 2023), https://archive.ph/MSvSt.
[17] Instagram Help Center, Terms of Use, (2023), https://archive.ph/pteWx.
[18] Meta Executives, Stephane Kasriel, Head of Commerce and Financial Technologies, (2023), http://archive.today/RnBhb.
[19] Meta Executives, Adam Mosseri, Head of Instagram, (2023), http://archive.today/f5F55.

30.     Personal jurisdiction exists over all of the Defendants as it relates to the COPPA claim pursuant to the nationwide service of process provision set forth in COPPA which provides that "[I]n an action brought under subsection (a), process may be served in any district in which the defendant – (A) is an inhabitant; or (B) may be found." 15 U.S.C. § 6504(e)(2). As set forth herein, Meta Payments is incorporated in Florida and all Defendants can be found in the Middle District of Florida, throughout Florida, and the United States.

31.     It is appropriate for this Court to exercise pendent personal jurisdiction over the FDUTPA claim given the existence of personal jurisdiction with respect to Plaintiff's COPPA claim and because the claims derive from a common nucleus of operative fact.

32.     Also, this Court has personal jurisdiction over Meta Payments for the COPPA and FDUTPA counts because Meta Payments is incorporated in Florida.  § 48.193(2), Fla. Stat. Meta and its subsidiaries operate as a common enterprise while engaging in the unfair, deceptive, and other unlawful acts and practices alleged below. Meta conducts business in this District through itself or its subsidiaries over which it exercises complete dominion and control.

33.     Further, this Court has personal jurisdiction over Defendants for Plaintiff's FDUTPA claim because of Meta's contacts in Florida pursuant to Florida's long-arm statute, section 48.193(1)(a), Florida Statutes. As described more fully below, Defendants enter into user agreements with young Floridians, benefit from advertising opportunities in Florida, and direct marketing efforts toward Florida businesses.

34.     Venue is proper in the Middle District of Florida because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. 28 U.S.C. § 1391(b)(2); and 15 U.S.C. § 6504(e).  The allegations in this Amended Complaint establish that a substantial part of Defendants' acts or omissions giving rise to Plaintiff's COPPA and FDUTPA claims occurred in this District.

35.     Moreover, before the MDL litigation was centralized in the Northern District of California, Meta recommended an appropriate alternate choice for centralizing the MDL litigation in the Middle District of Florida and advised the Middle District would be "equally convenient to the parties and counsel…."[20]

## IV. FACTUAL ALLEGATIONS

### A.  META ENGAGES IN TRADE OR COMMERCE THROUGH DATA COLLECTION AND ADVERTISING IN FLORIDA

#### 1.  According to Meta's own Terms of Service, Florida consumers pay for Meta's Social Media Platforms in the form of data, time, and attention

36.     Meta has engaged and continues to engage in conduct in Florida that constitutes trade or commerce as those terms are defined in § 501.203(8) of FDUTPA as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."

37.     Meta has continually engaged in trade or commerce by providing its Social Media Platforms to Floridians in this District and while young users can create accounts on those Platforms without paying a fee, Meta does not provide its products for free – rather, it charges its users by collecting their data and time, which Meta then converts into advertising dollars.

38.     To use Meta's Social Media Platforms, a young user creates an Instagram account and is required to enter into a contract with Meta Platforms and to comply with Meta's "Terms of Service."[21] "The Instagram Service is one of the Meta Products, provided to you by Meta Platforms,

---

[20] *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047, ECF 1 (N.D. Cal. Oct. 5, 2022); *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, J.P.M.L. No. 3047, ECF 44 (Aug. 30, 22)("Alternatively, an MDL could reasonably be sent to the Middle District of Florida or the Northern District of Georgia, both of which have pending cases, are equally convenient to the parties and counsel, and are suitable based on Movant's chosen metric for docket conditions."
[21] Instagram Help Center, *Terms of Use*, Meta (Oct. 18, 2023), https://www.facebook.com/help/instagram/478745558852511; *see also*, Facebook's Terms of
(continued…)

Inc. These Terms of Use therefore **constitute an agreement** between you and Meta Platforms, Inc." (emphasis added).

39.     Users do not pay money to use Instagram, but rather consumers are required to agree to terms that fuel Meta's advertising business which unlawfully and continuously gathers the personal data of children, including those under 13.

40.     In the section titled "How Our Service is Funded," the Instagram Terms of Service state that: "[i]nstead of paying to use Instagram, by using the Service covered by these Terms, you acknowledge that we can show you ads that businesses and organizations pay us to promote on and off the Meta Company Products. **We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.**" (emphasis added). The Instagram Terms of Service further state that "We [Meta] allow advertisers to tell us things like their business goal and the kind of audience they want to see their ads. We then show their ad to people who might be interested. We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Instagram. For example, we provide general demographic and interest information to advertisers to help them better understand their audience."

41.     Essentially, under the Instagram Terms of Service, consumers pay for the Instagram experience by allowing Meta to develop its advertising business with consumers' time and attention.

42.     This broad sweeping data, provided to advertisers, is governed by Meta's Privacy Policy, which users must agree to in order to create an account. This policy requires that users agree to the collection of user data for advertising purposes.  Specifically, the Instagram policy states that

Service, *Terms of Service*, Meta (last accessed Oct. 21, 2023), Facebook Terms of Service, https://m.facebook.com/legal/terms (last accessed April 29, 2024).

users' personal information will be used "to provide a personalized experience to you." This information is held for an indeterminate amount of time, transferred across borders with other countries, and shared across Meta's companies.

43.     Meta uses this information to "[p]rovide insights and measurement reports to businesses, advertisers and other partners to help them measure the effectiveness and distribution of their or their clients' ads, content and services, to understand the kinds of people who are seeing their content and ads, and how their content and ads are performing on and off Meta Products, and [p]rovide aggregated user analytics and insights reports that help businesses, advertisers and other partners better understand the audiences with whom they may want to connect."[22]

44.     By acknowledging Meta's Privacy Policy, Meta collects wide-ranging and continuous personal data about the consumer's activity on Instagram such as the  content the consumer creates, including posts comments or audio; content through Instagram's camera feature or the consumer's camera roll or voice-enabled features, such as masks, filters, avatars, and effects; messages the consumer sends and receives, including their content; types of content, including the ways the consumer interacts with ads; apps and features consumers use, and what actions are taken in them; purchases or other transactions made, such as through meta checkout experiences, including credit card information; hashtags used, and the time, frequency and duration of the consumers activities on Meta's products; hardware and software the consumer uses; and the GPS, Bluetooth signals, nearby Wi-Fi access points, beacons and cell towers; and many other categories of data.[23]

---

[22] Instagram Help Center, *Data Policy*, Meta (last accessed Oct. 18, 2023), https://help.instagram.com/155833707900388.
[23] Meta's Privacy Center, (last accessed April 29, 2024) https://privacycenter.instagram.com/policy/

45.     By capturing such broad and continuous data from each individual consumer, Meta capitalizes on the ability to offer its clients targeted advertising opportunities, including opportunities based on consumers' locations. In turn, Meta is motivated to maximize the time users spend on its Platforms as the more time a consumer spends on the Platforms, the more advertising opportunities Meta can sell, and the more data Meta collects about the consumer.

46.     Zuckerberg has explained that "online advertising allows much more precise targeting and therefore more-relevant ads,"[24] and this business model was succinctly summarized by Zuckerberg in his April 2018 Senate Hearing response to a question by Senator Hatch on how Facebook could run a successful business without charging users: "*Senator, we run ads*."[25] (emphasis added).

47.     At its core, Meta's business model relies on keeping its users, including children, perpetually on its Platforms so that it can continually collect as much data as possible about them with the goal of attracting advertisers with the bevy of information about its users.

### 2.   Meta Directed its Business Model to Florida

48.     Instagram is massively popular among Floridians, many of them children. Being the third most populus state, it is no surprise that Florida has been identified as being one of the states with the most Instagram users. The "Florida" hashtag has been used on Instagram almost 74 million times, which demonstrates Florida's popularity on Instagram.

49.     By design, Meta created highly interactive Platforms which serve Florida children a customizable experience, furthering Meta's business success and expanding its brand in Florida.

---

[24] Mark Zuckerberg, *Understanding Facebook's Business Model*, META, Jan. 24, 2019, https://about.fb.com/news/2019/01/understanding-facebooks-business-model/.
[25] *Facebook, Social Media Privacy, And The Use And Abuse Of Data: Joint Hearing Before The Committee On Commerce, Science, And Transportation United States Senate And The Committee On The Judiciary United States Senate*, 115 Cong. 21 (2018) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

50.     According to Meta's public advertising library, Meta regularly sells advertisements to countless entities throughout Florida, and in this District. Meta sells advertising to a large variety of Florida entities, from small businesses to large corporations with massive audiences, like Walt Disney World, Orlando Magic, Orlando City Soccer, Tampa Bay Buccaneers, and Tampa Bay Lightning, among others. Meta systematically and continually serves ads on its Platforms throughout the Middle District of Florida with a large advertising presence in the larger cities in this District, including Orlando and Tampa.

51.     These Florida-targeted advertising opportunities offered by Meta are a direct result of collecting Florida consumers' personal data which Meta exploits for commercial gain.

52.     Meta commits resources to encourage Florida entities to utilize Meta's advertising offerings thereby generating profit for Meta. For example, In 2021, Meta's former Chief Operating Officer Sheryl Sandberg ("Sandberg") held a roundtable discussion and met with Tampa Bay small business owners.[26] Sandberg highlighted several local Tampa Bay Facebook-fueled success stories as she touted the company's small business assistance programs during the coronavirus pandemic. Sandberg detailed initiatives to minority-owned businesses in 2020, including $40 million in grants to black-owned business, including 66 grants in Tampa Bay.[27]

53.     Sandberg also spoke at the James L. Knight Center to launch Meta's Miami edition of the Facebook Community Boost program designed to teach entrepreneurs how to promote their businesses via Facebook.[28] Miami was one of the cities selected for the program and, through the Community Boost program, Meta made a significant investment aggressively promoting itself to

---

[26] Jay Cridlin, *Facebook's Sheryl Sandberg praises Tampa small business in Chamber chat*, Tampa Bay Times (June 6, 2021), https://www.tampabay.com/news/business/2021/06/11/facebooks-sheryl-sandberg-praises-tampa-small-businesses-in-chamber-chat/.
[27] *Id.*
[28] Douglas Hanks and Rob Wile, *Sheryl Sandberg, back in Miami, says Facebook overlooked potential for abuse*, Miami Herald (Dec. 18, 2018), https://www.miamiherald.com/news/local/community/miami-dade/article223248555.html.

small businesses, providing them with free pages and services to manage their digital presence in hopes of turning them into paid advertisers.[29] According to Zuckerberg "It's important for (Facebook's) business. A lot of those folks end up advertising and being a part of the business."[30]

## B.  DEFENDANTS' SCHEME TO EXPLOIT YOUNG USERS FOR PROFIT

54.      Meta seeks to attract young people because they (1) are more likely to be influenced by advertisements, (2) become lifelong customers, and (3) set trends that the rest of society emulates. To draw young people into its ecosystem and keep them coming back, Meta employs technologies designed to maximize their time on and engagement with its Social Media Platforms.

55.      Meta exploits young users of its Platforms by deploying technology to create features that draw the attention of youth and sustain their engagement or time spent on its platforms so that it can sell more advertising opportunities to paying advertisers. Upon information and belief, when Meta succeeds in maintaining a user's interest through its algorithms, Meta is able to both collect more data and serve more targeted advertisements to the user.

### 1.  Meta's Products Induce Young Users' Harmful, Compulsive And Extended Use

#### a.  Infinite Scroll and Auto-Play Features

56.      One feature that Meta uses to capture young users' attention is the infinite scroll ("Infinite Scroll") design on its user interface. Infinite Scroll is characterized by the partial display of additional information at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation (without seeing the top portion of the next post in their feed).

57.      The previewing of new material continues indefinitely as the user scrolls down the feed.

---

[29] *Id.*

[30] Jessica Guynn, *Facebook unveils 30-city program to boost small business' digital skills*, USA TODAY (Nov. 9, 2017), https://www.usatoday.com/story/tech/2017/11/09/facebook-friends-small-businesses-facebook-community-boost/847094001

58.     The Infinite Scroll format makes it difficult for young users to disengage, because there is no natural end point for the display of new information.

59.     Instead, the Platform displays new information that has yet to be viewed, causing young users to worry about "missing out" (this phenomenon is called "Fear of Missing Out", or "FOMO").

60.     Meta also deploys the "Autoplay" feature to keep young users on Instagram and other Social Media Platforms by continuously showing videos.

**b. Likes and Social Comparison**

61.      Meta's Social Media Platforms encourage social comparison, such as likes ("Likes"), a quick way for users to select other users' photos and express validation or approval.

62.     Meta has elected to retain the Like feature despite concern regarding its impact on young users.

**c. Ephemeral Content Format**

63.     In 2016, Instagram introduced the stories surface ("Stories"), which was a copycat of Snapchat stories, allowing the user to post ephemeral photo and video slideshows that disappear within 24 hours.[31]

64.     Instagram Stories are shown at the top of the user's feed and because these videos are only available for a short period of time, users are incentivized to use the Instagram platform at least once per day. Children are conditioned to frequently open Meta's Social Media Platform so they will not experience Fear of Missing Out.

65.     Another example is the live feature ("Live") on the Platforms which gives users the ability to livestream videos to followers.[32] The videos released through Live are only available in

---

[31] Josh Constine, *Instagram launches "Stories," a Snapchatty feature for imperfect sharing*, TechCrunch (Oct. 12, 2023), https://techcrunch.com/2016/08/02/instagram-stories/.
[32] Instagram Help Center, *Live*, Meta (Oct. 18, 2023), https://help.instagram.com/272122157758915/?helpref=hc_fnav.

16

real-time. If a young user doesn't quickly join the live stream, the user will miss out on the chance to view the entire video.[33]

### 2. Meta's Platform Features Are Designed To Induce Young Users' Harmful, Compulsive and Extended Use

66.     Despite Meta's assurances to parents, lawmakers, and users that its Social Media Platforms are suitable for young users and designed to promote their well-being, it continues to develop and implement features that induce young users' harmful, extended and compulsive social media use.

67.     On numerous occasions, Meta has communicated that its features are not harmful and not designed to induce young users' addictive or compulsive social media use.

68.     In 2019, Adam Mosseri, Instagram Executive, told CBS that the well-being of its users is a top priority.[34]

69.     In 2021, Antigone Davis ("Davis"), Vice President, Meta Global Head of Safety, testified to Congress, "[w]e have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17."[35]

70.     Meta's leadership claims "… we don't allow young people to see certain types of content and have age-gating around certain types of content."[36] Davis also testified: "[w]hen it

---

[33] Instagram Help Center, *Notification Settings*, Meta (Oct. 18, 2023), https://help.instagram.com/105448789880240.

[34] CBS Morning News, *Instagram is seriously considering hiding likes, app's head reveals, CBS News* (Oct. 18, 2023), https://www.cbsnews.com/video/instagram-is-seriously-considering-hiding-likes-appshead-reveals/.

[35] *Protecting Kids Online: Facebook, Instagram, And Mental Health Harm: Hearing Before The Subcommittee On Consumer Protection, Product Safety, And Data Security Of The Committee On Commerce, Science, And Transportation United States Senate*, 117 Cong. 10 (2021) (Statement of Antigone Davis, VP Global Head of Safety, Facebook).

[36] *Protecting Kids Online: Facebook, Instagram, And Mental Health Harm: Hearing Before The Subcommittee On Consumer Protection, Product Safety, And Data Security Of The Committee On Commerce, Science, And Transportation United States Senate*, 117 Cong. 35 (2021) (Statement of Antigone Davis, VP Global Head of Safety, Facebook).

comes to those between 13 and 17, we consult with experts to ensure that our policies properly account for their presence, for example, by age-gating around certain types of content."[37]

71.    In 2021, Davis testified that Meta "made changes to our news feed to allow for more meaningful interactions, knowing that that would impact the time spent" and that Meta did this "because we were trying to build a positive, more positive experience…"[38]

72.    However, Meta has designed its Platforms to exploit the teenage brain's susceptibility to the addictive features of its Platforms.

### a.  Meta Deceptively Denies that its Products are Addictive

73.    Meta employs design features that work to override young users' attempts to disengage from Meta's Social Media Platforms. These tactics are wholly within Meta's control and Meta makes it difficult for young users to stop using Meta's products, independent of the content with which the users interact. Meta has long denied that its Social Media Platforms are designed to be addictive. In 2018, Facebook told the BBC that "at no stage does wanting something to be addictive factor into" the design process for its products.[39]

74.    In 2021, Davis testified before Congress that Meta does not build its products to be addictive; further, she disputed the addictive nature of Meta's products.[40]

---

[37] *Protecting Kids Online: Facebook, Instagram, and Mental Health Harm: Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Data Security of the H. Comm. on Commerce, Science, and Transportation*, 117th Cong. 35 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

[38] *Protecting Kids Online: Facebook, Instagram, and Mental Health Harm: Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Data Security of the H. Comm. on Commerce, Science, and Transportation*, 117th Cong. 39 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

[39] Hilary Andersson, *Social media apps 'deliberately' addictive to users*, BBC (July 4 2018), https://www.bbc.com/news/technology-44640959.

[40] *Protecting Kids Online: Facebook, Instagram, and Mental Health Harm: Hearing Before the Subcomm. on Consumer Protection, Product Safety, and Data Security of the H. Comm. on Commerce, Science, and Transportation*, 117th Cong. 38 (2021) (statement of Antigone Davis, VP Global Head of Safety, Facebook).

75.     During a congressional hearing in March 2021,  Zuckerberg stated "what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do…."[41]

76.     Zuckerberg played up the benefits of Meta's platforms to the committee, stating that "overall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely."[42]

77.     Meta's features contribute to the amount of time teens spend on Meta's Social Media Platforms, such as Instagram.

78.     Meta designs its products with the goal of consuming as much of the user's time as possible. In a 2017 interview, Sean Parker, a former president of Facebook, asks "how do we consume as much of your time and conscious attention as possible? That means that we need to [give a] sort-of dopamine hit once in a while because someone liked or commented on a photo or a post. . .that's gonna get you to contribute more content, and that's gonna get you . . . more likes and comments."[43]

---

[41] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 100 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

[42] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 56 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

[43] Erica Pandey and Sean Parker, *Facebook was designed to exploit human "vulnerability"*, Axios (Nov. 9, 2017), https://www.axios.com/2017/12/15/sean-parker-facebook-was-designed-to-exploit-human-vulnerability-1513306782 at 00:14.

19

79.     Mr. Parker further states in his interview that the creators of Meta's products, including Facebook and Instagram, knew of the addictive nature of these platforms yet "did it anyway."[44]

80.     Meta launched "Daily Limit," to enable users to limit the amount of time they spend on Instagram daily. Despite the feature's name, it does not enable users to restrict the amount of time they spend on the app.[45]

81.     In December 2021, the day before Instagram Executive Adam Mosseri was scheduled to appear before Congress, and shortly after a whistleblower highlighted Meta's impact on the well-being of teens onto the national stage, Instagram launched the "Take a Break" tool.[46] Take a Break sends users a pop-up notification when they have spent more than a specified period of uninterrupted scrolling time.

82.     Meta's so-called "time-management" tools cannot effectively counteract the overwhelming power of features like Infinite Scroll, Autoplay, and other use-inducing features.

**b. Meta Prioritizes Engagement Over Well-being**

83.     In October 2021, and in response to a 60 Minutes' report critiquing Meta's products, Meta made the following public statement: "protecting our community is more important than maximizing our profits."[47]

---

[44] Erica Pandey and Sean Parker, *Facebook was designed to exploit human "vulnerability"*, Axios (Nov. 9, 2017), https://www.axios.com/2017/12/15/sean-parker-facebook-was-designed-to-exploit-human-vulnerability-1513306782 at 00:55.

[45] Instagram Help Center, *Set a Daily Limit on Instagram*, Meta (last accessed Oct. 20, 2023 at 11:16am), https://help.instagram.com/2049425491975359/?cms_platform=iphone-app&helppref=platform_switcher.

[46] Adam Mosseri, *Raising the Standard for Protecting Teens and Supporting Parents Online*, Instagram (Dec. 7, 2021), https://about.instagram.com/blog/announcements/raising-the-standard-for-protecting-teens-and-supporting-parents-online.

[47] Clare Duffy, *Facebook whistleblower revealed on '60 Minutes,' says the company prioritized profit over public good*, CNN (Oct. 4, 2021), https://www.cnn.com/2021/10/03/tech/facebook-whistleblower-60-minutes/index.html.

84.     Upon information and belief, Meta has misrepresented its purported prioritization of teen well-being and safety over profits and fails to disclose the serious risks its features pose to young users' mental health.

85.     Upon information and belief, Meta has deceptively claimed for years that its top priority is the well-being of users, and that its Social Media Platforms are safe and age-appropriate platforms for young users.

> **i.     Meta's Deception Relating to Young Users' Body Dysmorphia and Eating Disorders**

86.     Upon information and belief, Meta also deceives the public by representing in its public communications that its Social Media Platforms do not allow content that promotes or encourages eating disorders, all while actively choosing to retain platform features known by Meta to promote those very problems, despite expert warnings about the resulting harm to young users.

87.     Upon information and belief, the compulsive use of Meta's platforms by young users promotes unhealthy body expectations. For example, one Florida youth alleges in a court filing that "[s]oon after starting to use Instagram, she was hooked; her use spiraled out of her control, injuring her self-image and self-esteem by a harmful barrage of images and videos that, among other things, promoted unrealistic body images and crushing dietary restrictions."

> **ii.     Meta Deceptive Statements on the Incidence of User Harm**

88.     Meta has publicly represented that the prevalence statistics in the Community Standard Enforcement Reports ("CSER") are a reliable measure of the safety of its Social Media Platforms—even going so far as to assert that the CSER prevalence numbers were the internet's equivalent of scientific measurements utilized by environmental regulators to assess the levels of harmful pollutants in the air.

89.     For example, in a May 2019 post on its website entitled "Measuring Prevalence of Violating Content on Facebook," Meta stated the following:

21

One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence. . . . We care most about how often content that violates our standards is actually seen relative to the total amount of times any content is seen on Facebook. This is similar to measuring concentration of pollutants in the air we breathe. When measuring air quality, environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people. Prevalence is the internet's equivalent — a measurement of what percent of times someone sees something that is harmful.[48]

90.     Zuckerberg has stated to Congress that Meta's prevalence numbers serve as a model for companies' transparency efforts.[49]

91.     Upon information and belief, Meta regularly publishes the CSER which deceptively boasts very low rates of violations of its community standards. The CSER, published quarterly, describes the percentage of content posted on Instagram that Meta removes for violating Instagram's community standards. Meta often refers to that percentage as its prevalence metric.[50]

92.     However, despite Meta's claims that it promotes safety and effectively prevents harmful content from reaching its users, young users have suffered and continue to suffer mental health and other consequences as a result of their compulsive and extended use of the Platforms which are designed to lure in the users and make it difficult for them to disengage.

### 3.   Meta's Ineffective Age Gating Practices Are Unfair And Deceptive

93.     Meta claims that it effectively monitors its Platforms for underage users but in reality, Meta does not use effective age gating procedures on its Platforms. In fact, it was only in response to pressure from regulators and the public that Meta purported to implement an age gate as part their Platforms' account registration process.

---

[48] Meta News, *Measuring Prevalence of Violating Content on Facebook* (May 23, 2019), https://about.fb.com/news/2019/05/measuring-prevalence/.
[49] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 49 (2021) (statement of Ma, Executive Chairman and CEO, Facebook).
[50] Meta Transparency Center, *Prevalence*, Meta (Nov. 18, 2022), https://transparency.fb.com/policies/improving/prevalence-metric/.

94.     Upon information and belief, this age-gate is ineffective because it does not prevent under-13 users from creating and using social media accounts.  Meta's Platforms have a significant number of users who self-report as under the age of 13.[51]

95.     Meta admits to wanting to appeal to young users. For example, in September 2021, in a statement in response to a news article regarding underage users on Instagram, Meta claimed that "[l]ike all technology companies, of course we want to appeal to the next generation, but that's entirely different from the false assertion that we knowingly attempt to recruit people who aren't old enough to use our apps."[52]

96.     Meta is aware that underage users are creating accounts on its Platforms but fails to acknowledge the extent of their presence or implement effective procedures to prevent their access. Meta claims "we know that young people can lie about their date of birth. We want to do more to stop this from happening. . ."[53]

97.     If an underage account is reported to Meta, Meta claims that "we will delete the account if we can't verify the account is managed by someone over 13 years old."[54] Zuckerberg told Congress, "if we detect that someone might be under the age of 13, even if they lied, we kick them off."[55]

---

[51] Katherine Schaeffer, *7 facts about Americans and Instagram*, Pew Research Center (Oct. 7, 2021), https://www.pewresearch.org/short-reads/2021/10/07/7-facts-about-americans-and-instagram/.

[52] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show*, WSJ (Sept. 28, 2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667.

[53] Instagram Blog, *Continuing to Make Instagram Safer for the Youngest Members of Our Community*, Meta (March 17, 2021), https://about.instagram.com/blog/announcements/continuing-to-make-instagram-safer-for-the-youngest-members-of-our-community.

[54] Instagram Help Center, *Underage Children*, Meta (Oct. 18, 2023), https://www.facebook.com/help/instagram/290666591035380.

[55] *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Virtual Joint Hearing Before the Subcomm. on Communications and Technology and the Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce*, 117th Cong. 76 (2021) (statement of Mark Zuckerberg, Executive Chairman and CEO, Facebook).

23

98.     While testifying before Congress in 2021, Meta's Global Head of Safety Antigone

Davis stated: "if we see someone trying to, repeatedly, change their [birth] date to get past that [age

screen], we actually will restrict their ability to access the app."[56]

99.     Despite its awareness that underage users are attempting to access and gaining

access to their Platforms, Meta consistently fails to acknowledge their presence and has not

employed effective age-gating to prevent their access—to do so would impact Meta's appeal to

advertisers seeking to reach young users and would require Meta to institute more effective

procedures to protect the data of children, including providing notice to parents and obtaining

parental consent to collect data from under-13 users prior to the collection and use of the protected

data.

100.    Based on information and belief, in many instances children have been able to

maintain accounts on Meta's Platforms, accounts that provide data to advertisers relating to these

young users despite Meta's claims that it will delete or block underage accounts.

### 4.  Health Effects On Young Users Of Meta's Platforms

101.    Heavy consumption of social media is associated with diminished mental health

outcomes.[57] For example, hours spent on social media and the internet are more strongly associated

with poor psychological health, such as self-harm behaviors, depressive symptoms, low life

satisfaction and low self-esteem.[58]

---

[56] *Protecting Kids Online: Facebook, Instagram, And Mental Health Harm: Hearing Before The Subcommittee On Consumer Protection, Product Safety, And Data Security Of The Committee On Commerce, Science, And Transportation United States Senate*, 117 Cong. 1 (2021) (Statement of Antigone Davis) at pg. 15.
[57] Jean Twenge & W. Keith Campbell, *Media Use Is Linked to Lower Psychological Well-Being: Evidence From Three Datasets*, Psych. Q. 90, 311 (2019).
[58] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations With Mental Health Vary By Activity And Gender*, 56 Soc. Psych. and Psych. Epidemiology 2017 (2021).

102.    Girls who use social media for 5+ hours per day are many times more likely to have clinically relevant symptoms of depression than non-users.[59] Research indicates heavy use of social media during developmental windows, like puberty, leads to lower life satisfaction ratings.[60]

103.    Even more concerning, social media use interferes with sleep. Heavier social media use was associated with poorer sleep patterns (e.g., later sleep and wake times on school days and trouble falling back asleep after nighttime awakening) and poorer sleep quality.[61] Adolescents who use social media for 5+ hours per day are three times more likely than non-users to not obtain adequate sleep.[62]

104.    For adolescents who are highly engaged social media users, even strict parental rules about social media use before bed does not result in better sleep quality and outcomes.[63]

105.    Additionally, young people can be particularly attuned to FOMO and may feel an extra need to be connected at night and to check social media. Unsurprisingly, many teens frequently wake up at night specifically to check social-media notifications.[64]

---

[59] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations With Mental Health Vary By Activity And Gender*, 56 Soc. Psych. and Psych. Epidemiology 2017 (2021).
[60] Amy Orben et al., *Windows of Developmental Sensitivity to Social Media, 13 Nature Communications* (2022), https://www.nature.com/articles/s41467-022-29296-3.pdf.
[61] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings From the UK Millennium Cohort Study*, 9 BMJ Open 1 (2019); Garrett Hisler et al., *Associations Between Screen Time and Short Sleep Duration Among Adolescents Varies By Media Type: Evidence From A Cohort Study*, 66 Sleep Medicine 99, 92-102 (2020).
[62] Hugues Sampasa-Kanyinga et al., *Use of Social Media is Associated With Short Sleep Duration In a Dose-Response Manner in Students Aged 11 To 20 Years*, 107 Acta Paediatrica 694, 694-700 (2018); *see also* Marian Freedman et al., *Social media and sleep duration-there is a connection!*, 35 Contemporary PEDS Journal 5 (2018).
[63] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescents' Sleep: A Longitudinal Study on the Protective Role of Parental Rules Regarding Internet Use Before Sleep*, 18 Intl. J., Environ. Res. Pub. Health 1346 (2021).
[64] Anushree Tandron et al., *Sleepless Due to Social Media? Investigating Problematic Sleep Due to Social Media and Social Media Sleep Hygiene*, 113 Comps. in Human Behavior 106487 (2020).

106.    Researchers have identified a positive feedback loop: those who use social media habitually are less able to regulate their behavior.[65]

## C.  META'S COPPA NONCOMPLIANCE

107.    The Children's Online Privacy Protection Act ("COPPA") protects the privacy of children by requiring technology companies like Meta to provide notice to and obtain authorization from parents prior to collecting the personal information of their children online.

### 1.  Meta's Legal Obligations Under COPPA With Respect to Instagram and Facebook

108.    COPPA prohibits social media companies from collecting a child's personal information without first obtaining verifiable parental consent if the data is collected by "an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1).

109.    Meta is also required to provide "notice on the website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information . . ." 15 U.S.C. § 6502(b)(A)(i).

110.    The term "child" is defined by 15 U.S.C. § 6501(1) "to mean an individual under the age of 13."

111.    The term "Verifiable Parental Consent" means:

> any reasonable effort (taking into consideration available technology), including a request for authorization for future collection, use, and disclosure described in the notice, to ensure that a parent of a child receives notice of the operator's personal information collection, use, and disclosure practices, and authorizes the collection, use, and disclosure, as applicable, of personal information and the subsequent use of the at information before that information is collected from that child.

15 U.S.C. § 6501(9).

---

[65] Maria T. Maza *et al.*, *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, JAMA Pediatrics (2023).

112.    COPPA empowers State Attorneys General to bring suit against companies that violate COPPA and permits State Attorneys General to obtain injunctive relief, damages, restitution, and other relief on behalf of residents of the State. 15 U.S.C. § 6504. A violation of COPPA also constitutes an unfair or deceptive practice in violation of FDUTPA.

113.    COPPA also requires the Federal Trade Commission ("FTC") to promulgate regulations consistent with the statute's regulations and the FTC has promulgated such regulations. 15 U.S.C. § 6502(b); *see* 16 C.F.R. § 312.2 *et seq*.

### 2.  Meta Possesses "Actual Knowledge" of Children on its Platforms and Collects Their Personal Information Without Obtaining Parental Consent.

114.    Meta is subject to COPPA's Verifiable Parental Consent requirement because it collects the personal information of under-13 users on its Platforms and, upon information and belief, has actual knowledge that it is collecting personal information from children.

115.    As described in Section (IV)(B)(3), Meta strives to attract underage users to its Platforms and based on information and belief, Meta possesses actual knowledge that a significant number of its users are under the age of 13.[66]

116.    Further, based on information and belief, Meta has collected data from specific children known by Meta to be under age 13.

### 3.  Meta's Platforms are "Directed to Children."

117.    Meta is also subject to COPPA's Verifiable Parental Consent requirement because its Platforms, or a portion thereof, are targeted to children. *See* 15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.2.

---

[66] Katherine Schaeffer, *7 facts about Americans and Instagram*, Pew Research Center (Oct. 7, 2021), https://www.pewresearch.org/short-reads/2021/10/07/7-facts-about-americans-and-instagram/.

118.    The FTC has promulgated regulations implementing Section 6502(b) of COPPA, including 16 C.F.R. § 312.2, which defines "directed to children" and sets forth factors for determining whether an online service, or a part thereof, is directed to children (and therefore subject to the statute's "verifiable parental consent" requirement). 16 C.F.R. § 312.2 provides in relevant part as follows:

> Website or online service directed to children means a commercial Website or online service, or portion thereof, that is targeted to children.
>
> (1) In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.
>
> …

16 C.F.R. § 312.2.

119.    An online service is "directed to children" if it "targets children as one of its audiences - even if children are not the primary audience." *COPPA July 2020 Guidance* § H(2).[67] Even if a website purports to target teenagers or adults, "in reality, [the] site may attract a substantial number of children under 13, and thus may be considered [to be] . . . 'directed to children' . . . ." *COPPA July 2020 Guidance* § H(2).[68]

120.    Under COPPA and applicable regulations, Instagram is "directed to children" because (1) Instagram's "audience composition" includes millions of under-13 users; (2) advertising that promotes Instagram and appears on Instagram is directed to children; (3) Meta's

---

[67] Federal Trade Commission Resources, *Complying With COPPA: Frequently Asked Questions; A Guide for Business and Parents and Small Entity Compliance Guide*, FTC (July 2020), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.
[68] Federal Trade Commission Resources, *Complying With COPPA: Frequently Asked Questions; A Guide for Business and Parents and Small Entity Compliance Guide*, FTC (July 2020), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.

design of the Instagram registration process effectively welcomes children to use Instagram; and, (4) subject matter, characters, activities, music, and other content on Instagram are child-oriented.

121.    Upon information and belief, Instagram's audience composition includes millions of under-13 users. Under 16 C.F.R. § 312.2, empirical evidence regarding audience composition is relevant to determining whether an online service, or a portion thereof, is directed to children.

### a. Advertising that appears on Meta's Platforms is directed to children

122.    Under 16 C.F.R. § 312.2, whether "advertising promoting or appearing on . . . the online service is directed to children" is relevant to determining whether an online service, or a portion thereof, is directed to children.

123.    Upon information and belief, Meta has published advertising campaigns featuring individuals who appear to be children or teens.

124.    Upon information and belief, these advertisements and others by Meta were directed at children and teens and featured individuals who appeared to be children or teens.

125.    Under 16 C.F.R. § 312.2, the "age of models, presence of child celebrities, [and] celebrities who appeal to children" is relevant to determining whether an online service, or a portion thereof, is directed to children.

### b. Subject matter, characters, activities, music, and other content on Meta's Platforms are child-oriented

126.    Under 16 C.F.R. § 312.2, "subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content" is relevant to determining whether an online service, or a portion thereof, is directed to children.

127.    For example, according to Meta's Ad Library website, an advertisement promoting the PBS Kids television show "Wild Kratts" and the "PBS KIDS Prime Video Channel" was run on Meta's Social Media Platforms in July 2023.[69]

128.    Upon information and belief, Meta's Platforms publicly hosts accounts and pages on that include child-oriented subject matter.

### 4. Meta Does Not Obtain Verifiable Parental Consent Before Collecting Under-13 Users' Personal Information on Meta's Platforms

129.    To obtain verifiable parental consent, Meta must (1) first provide notice to the parent of the company's "personal information collection, use, and disclosure practices," then (2) obtain the parent's authorization for the company to "collect[], use, and disclos[e], as applicable . . . personal information and the subsequent use of that information," all in conformity with the COPPA regulations and all prior to the child's information being collected. 15 U.S.C. § 6501. Based on information and belief, Meta fails to obtain verified parental consent prior to collecting data of users under age 13.

## V.  CAUSES OF ACTION

### COUNT I
### Violation of the Florida Deceptive and Unfair Trade Practices Act
### (All Defendants)

130.    Plaintiff Attorney General adopts, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

131.    This is an action against all Defendants for violation of FDUTPA.

132.    Defendants' promotion, marketing, and advertising of its products in the State of Florida involves trade or commerce within the meaning of FDUTPA, which states in relevant part:

---

[69] Meta Ad Library (last accessed Oct. 18, 2023),
https://www.facebook.com/ads/library/?active_status=all&ad_type=all&country=US&q=%22pbs
%20kids%22&sort_data[direction]=desc&sort_data[mode]=relevancy_monthly_grouped&search
_type=keyword_exact_phrase&media_type=all.

"[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." § 501.204, Fla. Stat. (2023).

133.     The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat. (2023).

134.     When construing whether acts or practices violate FDUTPA, it is the intent of the Legislature that "due consideration and great weight shall be given to the interpretations [by] the Federal Trade Commission and the federal courts relating to the … Federal Trade Commission Act." § 501.204(2), Fla. Stat. (2023).

135.     Meta engages in unfair practices that offend public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

136.     Meta's unfair acts include but are not limited to Meta's choice to target its Social Media Platforms to children, including Florida children who are under age 13, while knowingly designing its Social Media Platforms to include features known to promote compulsive, prolonged, and unhealthy use by children, and Meta's failure to adopt effective age-gating procedures to prevent access by underage users.

137.     Features employed by Meta's Platforms such as infinite scroll, ephemeral content, autoplay, and disruptive alerts are unfairly used by Defendants to extract additional time and attention from children whose developing brains were not equipped to resist those manipulative tactics.

31

138.   Defendants' acts and omissions alleged herein also have caused and continue to cause substantial injury to child users of its Platforms that could not be reasonably avoided by consumers and does not result in any countervailing benefit to consumers or competition.

139.   In connection with the advertising, marketing, and promotion of their products, Defendants made and continue to make deceptive representations to the public that are likely to mislead consumers acting reasonably under the circumstances. These include, but are not limited to, the following deceptive representations by Meta:

A.   Meta's Social Media Platforms are not psychologically or physically harmful for children and are not designed to induce children's compulsive and extended use, when they are so designed;

B.   Meta's Social Media Platforms are not addictive, are not designed to be addictive and less likely to result in psychological and physical harm for children than their Social Media Platforms are in reality;

C.   The Community Standard Enforcement Report indicates that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

D.   Meta prioritizes children's health and safety over maximizing profits, when in fact Meta subordinates children's health and safety to their goal of maximizing profits by prolonging young users' time spend on their Social Media Platforms;

E.   Under-13 users are effectively excluded by Meta from using Instagram and/or Facebook when there are not effective age-gating systems in place;

F.      Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Defendants collected user data; and,

G.      Other false and deceptive representations.

140.    Defendants engage in representations, acts, practices, or omissions which are material, and which are likely to mislead consumers acting reasonably under the circumstances.

141.    Defendants knew or should have known that their conduct was deceptive or prohibited by statute.

142.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of FDUTPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**COUNT II**
**VIOLATIONS OF COPPA**
**(All Defendants)**

143.    Plaintiff realleges and incorporates the paragraphs preceding Count I as though fully alleged in this cause of action.

144.    Defendants have actual knowledge of children under the age of 13 on their Social Media Platforms and direct their Social Media Platforms towards children under the age of 13.

145.    Defendants collect personal information about children under the age of 13 and fail to provide direct notice to the parents about the information they collect from children, how they use such information, and their disclosure practices in violation of COPPA, 15 U.S.C. § 6502(a); and 16 C.F.R. § 312.4(b)-312.4(c).

146.    Defendants have failed and continue to fail to provide sufficient notice on their Social Media Platforms about the information they collect from children and how they use such information, and their disclosure practices are in violation of COPPA and 16 C.F.R. § 312.4(d).

147.    Defendants have failed and continue to fail to obtain verifiable parental consent prior to collecting or using any personal information of children, in violation of COPPA and 16 C.F.R. § 312.5.

148.    Under 16 C.F.R. § 312.9, a violation of COPPA constitutes an unfair or deceptive practice, in violation of 15 U.S.C. § 45 and FDUTPA.

149.    Florida residents are suffering, have suffered, and will continue to suffer substantial injury resulting from Defendants' violations of COPPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.    Pursuant to §§501.201 *et. seq.*, of FDUTPA and §§6501 *et seq.* of COPPA, enter judgment in favor of Plaintiff and against Defendants;

B.    Temporarily and permanently enjoin Defendants to prevent future violations pursuant to § 501. 207(b) of FDUTPA and § 6504(a) of COPPA;

C.    Award civil penalties and attorney's fees for willful violations of FDUTPA pursuant to §§ 501.2075 and 501.2077, Fla. Stat. (2023);

D.    Grant such legal or equitable relief authorized by §§501.201, *et. seq.* of FDUTPA, and §6504(a) of COPPA.

1

2

3    Dated: April 29, 2024                          Respectfully submitted,

4                                                   **ASHLEY MOODY**
                                                    **Attorney General of the State of Florida**

5

6                                                    */s/ Victoria Ann Butler*

7
                                                    Victoria Ann Butler
8                                                   *pro hac vice*
                                                    Director of Consumer Protection Litigation
9                                                   Florida Bar No. 861250
                                                    Office of the Attorney General Consumer
10                                                  Protection Division 3507 E. Frontage Road,
                                                    Suite 325
11                                                  Tampa, FL 33607
                                                    Tel.: (813) 287-7950
12                                                  Victoria.Butler@myfloridalegal.com
                                                    LEAD COUNSEL FOR THE PLAINTIFF
13

14                                                  John M. Guard
15                                                  *pro hac vice*
                                                    Chief Deputy Attorney General
16                                                  Florida Bar No. 374600
                                                    Office of the Attorney General PL-01
17                                                  The Capitol Tallahassee, FL 32399
                                                    John.Guard@myfloridalegal.com
18

19                                                  Nicholas J. Weilhammer
                                                    *pro hac vice*
20                                                  Associate Deputy Attorney General for
                                                    Enforcement
21                                                  Florida Bar No. 479322
                                                    Office of the Attorney General
22                                                  PL-01 The Capitol
                                                    Tallahassee, FL 32399
23                                                  Tel.: (850) 414-3861
                                                    Nicholas.Weilhammer@myfloridalegal.com
24

25

26                                                  Donna Cecilia Valin
                                                    *pro hac vice*
27                                                  Special Counsel, Assistant Attorney General
                                                    Florida Bar No. 96687
28

35

Office of the Attorney General
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
Tel.: (407) 316-4840
Donna.Valin@myfloridalegal.com

1

2
**CERTIFICATE OF SERVICE**

3
   I hereby certify that on April 29, 2024, I electronically filed the foregoing document with

4
the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

5
e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

6

7

8
          By: */s/ Victoria Ann Butler*
             Victoria Ann Butler

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, FL AG's Amended Complaint (Case No. 4:22-md-03047 and 4:23-cv-05885-YGR)