UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION**<br><br>This Document Relates to:<br>4:23-cv-05885<br><br>**Office of the Attorney General, State of Florida, Department of Legal Affairs,**<br>Plaintiff,<br>v.<br>**Meta Platforms, Inc., *et al.*,**<br>Defendants. | MDL No. 3047<br><br>Case No. 4:23-cv-05885-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART META'S MOTION TO DISMISS THE FLORIDA ATTORNEY GENERAL AMENDED COMPLAINT**<br><br>Re: Dkt. No. 950 in<br>Case No. 22-md-03047; and<br><br>Dkt. No. 30 in<br>Case No. 23-cv-05885 |

In this consolidated, multi-district litigation ("MDL"), defendants Meta Platforms, Inc., Instagram LLC, and Meta Payments, Inc. (collectively, "Meta") move to dismiss the amended complaint brought by the Office of the Attorney General of Florida ("Florida") for (i) improper venue in the U.S. District Court for the Middle District of Florida (the "FLMD court") as to Florida's claim under the Children's Online Privacy Protection Act ("COPPA"), (ii) failure to state a claim against defendant Meta Payments, Inc. under a common-enterprise theory of liability, and (iii) lack of personal jurisdiction in the FLMD court as to Florida's claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). For the reasons set forth herein, defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. Procedural Background

The Court recently resolved Meta's motion to dismiss the claims asserted in the complaint brought by the multistate coalition of 34 attorneys general ("AGs") as well as the claims asserted in the Florida AG's separately filed complaint. *In re Soc. Media Adolescent Addiction/Pers. Inj.*

United States District Court
Northern District of California

*Prod. Liab. Litig.*, 2024 WL 4532937 (N.D. Cal. Oct. 15, 2024) (No. 22-md-3047, Dkt. No. 1214; No. 23-cv-05885, Dkt. No. 38).[1] Relevant here, on April 29, 2024, Florida filed its amended complaint (No. 23-cv-05885, Dkt. No. 23 ("Am. Compl.")), and on June 18, 2024, Meta moved to dismiss Florida's amended complaint for improper venue and lack of personal jurisdiction (No. 22-md-3047, Dkt. No. 950; No. 23-cv-05885, Dkt. No. 30). The Court heard argument on September 13, 2024.

**B. Relevant Facts Alleged**

Florida brings claims of unfair and deceptive acts and practices under COPPA and FDUTPA against Meta Platforms, Inc., Instagram LLC, and Meta Payments, Inc. The Court's prior order evaluating Meta's motion to dismiss these claims on their merits described their underlying factual allegations, which the Court incorporates herein by reference. *In re Social Media*, 2024 WL 4532937, at *2–8. Below, the Court sets forth additional allegations specific to Florida relevant to the instant motion to dismiss.

**1. Jurisdictional Facts**

Meta Platforms is a Delaware corporation with its principal place of business in Menlo Park, California. (Am. Compl. ¶ 15.) Meta Platforms "formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Amended Complaint and currently operates its business primarily through its subsidiaries including Instagram and Meta Payments." (*Id.*) Meta Platforms operates Facebook, a social media platform. (*Id.* ¶ 18.)

Instagram is a limited liability company incorporated in Delaware with its principal place of business in Menlo Park, California, and is a wholly owned subsidiary of Meta Platforms. (*Id.* ¶ 20.) Instagram operates its namesake social media platform under Meta's auspices. (*Id.*)

Meta Payments is a wholly owned subsidiary of Meta Platforms and has been incorporated

[1] In that motion, Meta also moved to dismiss Florida's complaint, filed in the FLMD court, for improper venue and lack of personal jurisdiction. However, the Court denied that portion of Meta's motion as moot, *see In re Social Media*, 2024 WL 4532937 at *60 n.101, because at the April 19, 2024, hearing on Meta's motion, the Court granted Florida leave to replead its claims with respect to jurisdiction. (Dkt. No. 785, Tr. of April 19, 2024 Case Management Conference at 126:23–127:2.)



United States District Court
Northern District of California

in Florida since December 2010. (*Id.* ¶ 22.) "Meta Payments manages, secures, and processes payments made through Meta. Meta's financial connection to its users, including advertising, is made through Meta Payments." (*Id.*)

When an individual, including a minor in Florida, creates an account on Instagram, the person is required to enter into a contract with Meta Platforms and comply with its terms of service. (*Id.* ¶ 38.) Users do not pay money to Instagram but instead agree to terms that permit Meta to collect personal data—including of children under 13—which in turn fuels Meta's advertising business. (*Id.* ¶ 39.) According to Meta's Privacy Policy, the personal data collected by Meta includes:

> the content the consumer creates, including posts comments or audio; content through Instagram's camera feature or the consumer's camera roll or voice-enabled features, such as masks, filters, avatars, and effects; messages the consumer sends and receives, including their content; types of content, including the ways the consumer interacts with ads; apps and features consumers use, and what actions are taken in them; purchases or other transactions made, such as through [M]eta checkout experiences, including credit card information; hashtags used, and the time, frequency and duration of the consumers activities on Meta's products; hardware and software the consumer uses; and the GPS, Bluetooth signals, nearby Wi-Fi access points, beacons and cell towers; and many other categories of data.

(*Id.* ¶ 44.)

Meta relies on this data to target and deliver relevant ads to users in Florida. (*Id.* ¶¶ 46, 49.) According to Meta's public advertising library, Meta sells advertising to a variety of entities in Florida which include Walt Disney World, Orlando Magic, Orlando City Soccer, Tampa Bay Buccaneers, and Tampa Bay Lightning, among others. (*Id.* ¶ 50.) Meta also "commits resources to encourage Florida entities to utilize Meta's advertising offerings." (*Id.* ¶ 52.) For instance:

> In 2021 Meta's former Chief Operating Officer Sheryl Sandberg ("Sandberg") held a roundtable discussion and met with Tampa Bay small business owners. Sandberg highlighted several local Tampa Bay Facebook-fueled success stories as she touted the company's small business assistance programs during the coronavirus pandemic. Sandberg detailed initiatives to minority-owned businesses in 2020, including $40 million in grants to black-owned business, including 66 grants in Tampa Bay.



United States District Court
Northern District of California

> Sandberg also spoke at the James L. Knight Center to launch Meta's Miami edition of the Facebook Community Boost program designed to teach entrepreneurs how to promote their businesses via Facebook. Miami was one of the cities selected for the program and, through the Community Boost program, Meta made a significant investment aggressively promoting itself to small businesses, providing them with free pages and services to manage their digital presence in hopes of turning them into paid advertisers. According to [Mark] Zuckerberg[,] "It's important for [Facebook's] business. A lot of those folks end up advertising and being a part of the business."

(*Id.* ¶¶ 52–53 (footnotes omitted).)

#### 2. Meta Payments

Meta Platforms "operates its business primarily through its subsidiaries including . . . Meta Payments." (*Id.* ¶ 15; *see also id.* ¶ 26 (Meta Payments is "within the Meta family of products."); *id.* ¶¶ 38, 40 (describing how Meta's terms of service refers to the "Meta Company Products" as one homogenous product offering).) Meta Payments "oversees all commerce and fintech work across Meta's technologies and platforms." (*Id.* ¶ 27.)

Meta's entities collaborate and rely on shared resources: "Meta employees use shared email systems," "Meta's internal divisions and teams work collaboratively to govern Meta's day-to-day operations," and "Meta Defendants share corporate headquarters and senior executives," including Mark Zuckerberg, who all exercise control over "important policy and staffing decisions related to Meta." (*Id.* ¶ 25.) Consumer data collected through Meta's platforms is shared between all the Meta defendants. (*Id.* ¶¶ 43, 44.) This personal data collection is governed by Meta's Privacy Policy, which explicitly notes the data is "shared across Meta's Companies." (*Id.* ¶ 42.)

## II. LEGAL FRAMEWORK

### A. Choice of Law

"Pursuant to *Erie* and its progeny, federal courts sitting in diversity apply state substantive law and federal procedural law." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003). In an MDL, the transferee court applies the law of its circuit to issues of federal law, but on issues of state law it applies the state law that would have been applied to the underlying case as if it had never been transferred into the MDL. *In re Anthem, Inc. Data Breach Litig.*, 2015 WL 5286992, at *2 (N.D. Cal. Sept. 9, 2015) (collecting Ninth Circuit cases).

The parties do not dispute that choice of venue presents a question of federal procedural law.[2] *See Galaviz v. Berg*, 763 F. Supp. 2d 1170, 1171 (N.D. Cal. 2011) ("[F]ederal procedural law . . . controls such venue issues . . . ."); *Engel v. CBS, Inc.*, 886 F. Supp. 728, 731 (C.D. Cal. 1995) ("[T]he venue statute is a procedural statute . . . ."); *Hadlich v. Am. Mail Line*, 82 F. Supp. 562, 563 (N.D. Cal. 1949) ("Essentially venue is an incidence of procedure.").

As to personal jurisdiction, "the transferee court in an MDL 'is entitled to exercise personal jurisdiction over each defendant only to the same degree that the original transferor court could have.'" *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig.*, 2024 WL 3811994, at *3 (N.D. Ga. Aug. 13, 2024) (quoting *In re Dynamic Random Access Memory (Dram)*, 2005 WL 2988715, at *2 (N.D. Cal. Nov. 7, 2005)). Courts recognizing this proposition have taken opposite, but not entirely dissimilar, approaches in selecting the applicable law. One strand of cases looks to the law of the state in which the transferor forum sits for analyzing the state's long-arm statute, and to the law of the transferor forum's circuit for federal due process considerations. *See, e.g.*, *In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F. Supp. 2d 289, 300 (E.D.N.Y. 2002) (citing Texas and Fifth Circuit law); *see also Cannon v. Ethicon, Inc.*, No. 2:15-CV-05858, 2020 WL 7322725, at *1 (S.D.W. Va. Dec. 11, 2020) (citing California and U.S. Supreme Court law). On the other hand, some transferee courts recognize that where "personal jurisdiction is to be assessed with regards to federal due process law," "federal law accordingly controls," and so the "court will look to its own circuit as the source for federal law." *In re Dynamic Random Access Memory (Dram)*, 2005 WL 2988715, at *2.

In the instant motion to dismiss, the parties variously apply out-of-circuit caselaw—predominantly from the Eleventh Circuit—with respect to issues of venue and personal jurisdiction, both of which (excepting state long-arm statutes) have roots in federal statutory and constitutional law. The Court need not resolve which of the above approaches to choice of law it should take because (1) the parties agree there is no material difference between the law of the Ninth and Eleventh Circuits for purposes of this motion (Dkt. No. 1170, Tr. of Sept. 13, 2024 Case

[2] *See* Dkt. No. 1170, Tr. of Sept. 13, 2024 Case Management Conference at 9:10–15.

Management Conference at 8:21–9:17), and (2) the novel questions presented in this motion nonetheless require discussion of out-of-circuit persuasive authority.

### B. Motion to Dismiss

The standard under Federal Rule of Civil Procedure 12(b)(6) is well-known, not in dispute, and previously outlined. The Court will not restate it here.

## III. DISCUSSION

### A. The COPPA Claim

Meta argues that the FLMD court is an improper venue for the State's COPPA claim, warranting its dismissal.[3]

In terms of the legal framework, COPPA's venue provision, 15 U.S.C. § 6504(e)(1), refers to the general federal venue statute, 28 U.S.C. § 1391. Section 1391(b) authorizes venue under three scenarios: (1) in a judicial district in which any defendant resides, if all defendants are residents of the state of the district, (2) in a judicial district in which a substantial part of the events giving rise to the claim occurred, or a substantial part of property that is the subject of the action, or (3) if neither of those options, then any district that has personal jurisdiction. 28 U.S.C. § 1391(b).

Here, Florida cannot establish venue under two of the three subsections. First, venue is not viable in FLMD under subsection 1391(b)(1) because not all defendants are residents of Florida.

---

[3] As a preliminary note, Meta does not contest that the FLMD court has personal jurisdiction over the Meta entities as to this claim. Subsection 6504(a) of COPPA authorizes "the State, as *parens patriae*, [to] bring a civil action on behalf of the residents of the State in a district court of the United States of appropriate jurisdiction" "[i]n any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by the engagement of any person in a practice that violates any regulation of the Commission prescribed under section 6502(b)," that is, any practice that violates the Commission's COPPA Rule. 15 U.S.C. § 6504(a)(1). Subsection 6504(e)(2) further provides that in an action brought under subsection 6504(a), "process may be served in any district in which the defendant" "is an inhabitant" or "may be found." *Id.* § 6504(e)(2). The Ninth Circuit has held that a "district court has nationwide personal jurisdiction" over a defendant pursuant to a federal statute's "nationwide service of process provision." *FTC v. Americans for Fin. Reform*, 720 F. App'x 380, 383 (9th Cir. 2017); *see also New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 448 F. Supp. 3d 1263, 1268 (D.N.M. 2020) (quoting *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210 (10th Cir. 2000)).

Second, because venue would be permissible in at least the Northern District of California under subsection (b)(2)—given the centrality of this district as a primary location of Meta's operations—then the FLMD is not a proper venue under subsection 1391(b)(3). Thus, the question is whether venue can be authorized under subsection 1391(b)(2), *i.e.*, whether "a substantial part of the events giving rise to the [COPPA] claim occurred" in FLMD.

Under subsection 1391(b)(2), "[o]nly the events that directly give rise to a claim are relevant" to venue. *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). While a plaintiff need not select a venue with "the *most* substantial nexus to the dispute," a substantial part of the events giving rise to the claim must have occurred there. *E.g.*, *Careplus Health Plans, Inc. v. Crespo*, 2006 WL 1382102, at *2 (M.D. Fla. May 19, 2006) (citation omitted). Conclusory statements cannot establish venue. *Corley v. Osprey Ship Mgmt., Inc.*, No. 06-60275-CIV, 2007 WL 201263, at *2 (S.D. Fla. Jan. 24, 2007).[4]

To determine whether subsection 1391(b)(2) is satisfied, the Court turns to the elements of a COPPA claim. It provides that "[i]t is unlawful [1] for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, [2] to collect personal information from a child in a manner that violates the" COPPA Rule's requirements. 15 U.S.C. § 6502(a); *see also In re Social Media*, 2024 WL 4532937, at *11. The COPPA Rule requires the operator to (a) "[p]rovide notice on the Web site or online service of what information it collects from children, how it uses such information, and

[4] Meta's reliance on *Jamba Juice* is unhelpful. In *Jamba Juice Co. v. Jamba Grp., Inc.*, the plaintiff contended that venue was appropriate in the Northern District of California for claims of trademark violations because "defendant operates a website that may be accessed in the Northern District and because plaintiff's principal place of business is in San Francisco," thus the confusion caused by defendant's conduct was most likely to occur in the Northern District. No. C-01-4846 VRW, 2002 WL 1034040, at *1 (N.D. Cal. May 15, 2002). The court disagreed. "The fact that defendant operates a website, which may be accessed anywhere in the United States, and that plaintiff's principal place of business is in the Northern District does not, however, establish that venue is proper in the Northern District. To accept plaintiff's contention would be to adopt a rule that would subject any corporation with a website to venue in the district in which plaintiff does business." *Id.* at *2. This case, by contrast, does not involve merely passive conduct by Meta. *Jamba Juice Co.* rested on a materially different set of facts and claims at issue.

its disclosure practices for such information," (b) "[o]btain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children," (c) "[p]rovide a reasonable means for a parent to review the personal information collected from a child and to refuse to permit its further use or maintenance," (d) "[n]ot condition a child's participation in a game, the offering of a prize, or another activity on the child disclosing more personal information than is reasonably necessary to participate in such activity," and (e) "[e]stablish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children." 16 C.F.R. § 312.3.

Meta's activity with respect to these rules plausibly begins in corporate facilities where coding occurs to "provide notice," obtain consent, provide a means to review information collected, and establish and maintain procedures to protect the collected information. The receiving end of these actions occurs wherever users interact with the platform.

Florida argues that venue is appropriate because, in particular: (i) Florida users (including children) are required to agree to Meta's terms of service, (ii) Meta continuously captures a broad set of data from each individual consumer in the district, (iii) and in so doing, Meta offers its clients targeted advertising based on individual consumers' locations in the district, (iv) which Meta sells to numerous Florida entities (*e.g.*, Walt Disney World, Orlando Magic, etc.), (v) providing said entities with ad measurement reports based on Florida user views. (Am. Compl. ¶¶ 38–40, 43–52.)

The mere collection of data is insufficient. None of these proffered allegations "give rise" to a COPPA violation as described above. While these facts may be relevant to whether Meta purposefully availed itself of the forum district, discussed *infra* in the context of the State's FDUTPA claim, the allegations upon which Florida bases its argument do not help establish a COPPA claim. At most, Florida can point to the collection of personal information from a child. Such collection occurs in two places virtually at once—the locations from which the data is pulled and to which the data is deposited. Even assuming it would be proper to consider the "collection" as occurring in Florida, the Court does not consider, on balance, that this activity alone constitutes "a substantial part of the events or omissions giving rise to" Florida's COPPA claim. *See* 28

U.S.C. § 1391(b)(2).[5] More is required.

Meta's motion to dismiss the Florida's COPPA claim for improper venue is **GRANTED**.

**B. Meta Payments**

While Meta seeks dismissal of Meta Platforms and Instagram without prejudice for improper venue and lack of personal jurisdiction, Meta seeks dismissal of Meta Payments *with prejudice* for failure to state a claim. Meta argues that because the amended complaint fails to allege sufficiently that a "common enterprise" between the other two entities exist or that Meta Payment's own participation in any activity related to the COPPA and FDUTPA claims, the claims fail.[6]

Under a common enterprise theory of liability, "a corporate entity can be held liable for the conduct of other entities where the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1269 (S.D. Fla. 2019) (quoting *FTC v. Lanier L., LLC*, 715 F. App'x 970, 979 (11th Cir. 2017)).[7] "When a common enterprise exists, each corporation may be held liable for the others' violations." *FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246, 1257 (M.D. Fla. 2018), *aff'd*, No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9, 2022). "There is

---

[5] The parties also dispute the fairness of finding venue in the FLMD. The State argues, in effect, that it would be unfair to require COPPA claims to be asserted only in a defendant's locale, while Meta contends that it would be unfair to require it to be haled into every state by the respective attorney general in which it allegedly collects data from children, *i.e.*, in theory every single federal district court. Fairness is not a component of the fact-focused inquiry provided in subsection 1391(b)(2). Either a substantial part of the conduct giving rise to the claim occurs in the forum district, or it does not.

[6] Meta also argues that the amended complaint does not allege that Meta Platforms formed Meta Payments as a mere "front" to avoid liability. *See FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d at 1258 (discussing how certain "Shell Defendants" "were used as fronts" for other defendant entities). Florida does not appear to contest this point.

[7] Meta relies on cases applying common-enterprise liability as available under the FTC Act. Florida does not dispute this standard and agrees that common-enterprise liability has been repeatedly applied to FDUTPA claims. *See, e.g.*, *Life Mgmt. Servs.*, 350 F. Supp. 3d at 1259 (finding entities were "engaged in a common enterprise" under the FTC Act and FDUTPA), *aff'd*, No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9, 2022).

not one universal or mandatory" test to find a common enterprise, and courts must look to "the pattern and frame-work of the whole enterprise." *Id.* (citation omitted). Courts consider "a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants." *FTC v. Direct Benefits Grp., LLC*, No. 11-CV-1186, 2013 WL 3771322, at *18 (M.D. Fla. July 18, 2013) (quoting *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 533 (E.D. Pa. 2013)).

The fact of corporate association alone is typically insufficient to find a "common enterprise" exists.[8] Rather, courts find entities operate as a common enterprise where each is alleged to contribute to the injurious conduct. *See, e.g.*, *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d at 1269 (describing corporate defendants' "extensive cooperation . . . to induce customers"); *FTC v. Direct Benefits Grp., LLC*, 2013 WL 3771322, at *19 ("The corporate entities *worked cooperatively and complemented one another* . . . ." (emphasis supplied)); *FTC v. Ivy Cap., Inc.*, No. 11-CV-283, 2013 WL 1224613, at *14 (D. Nev. Mar. 26, 2013) ("The roles of each entity varied, but *all had a distinct role to play* as part of the scam." (emphasis supplied)), *aff'd in part, vacated in part, remanded*, 616 F. App'x 360 (9th Cir. 2015); *FTC v. AMG Servs., Inc.*, No. 2:12-CV-00536-GMN, 2012 WL 6800525, at *7 (D. Nev. Nov. 1, 2012) ("[T]he FTC explains *the role each defendant played* and how each defendant is related to the others." (emphasis supplied)), *report and recommendation adopted*, 2012 WL 6800778 (D. Nev. Dec. 28, 2012); *FTC v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2012 WL 1890242, at *2 (E.D.N.Y. May 23, 2012) ("*The role played by each* of the newly-added defendants in the venture was one that bespeaks a common enterprise." (emphasis supplied)).[9]

---

[8] In general, a subsidiary is not liable for the acts of its parent where the subsidiary was not involved in the conduct giving rise to the litigation. *See, e.g.*, *Anderson v. Deere & Co.*, 852 F.2d 1244, 1247 (10th Cir. 1988) (allegations of subsidiary liability failed "because the subsidiaries were not involved in the transactions giving rise to this litigation"); *see also McCabe v. Henpil, Inc.*, 889 F. Supp. 983, 992 (E.D. Tex. 1995) ("[U]nder the alter ego theory, the subsidiary corporation is not liable for the acts of the parent or shareholder merely on the basis of alter ego.").

[9] Florida's cases are consistent with these approaches. *See Life Mgmt. Servs.*, 350 F. Supp.

Three cases provide good examples. In *FTC v. Pointbreak Media, LLC*, the court found a report "describe[d] extensive cooperation between the [entities] to induce customers to purchase their services." 376 F. Supp. 3d at 1269. As examples, the court noted that (i) the companies shared client data; (ii) two companies sold their separate services exclusively to other defendants; (iii) one company scheduled sales calls for another; and (iv) "tellingly," employees of two of the companies did not distinguish between the two and represented to customers that the two companies were a single business. *Id.* Thus, these entities activities as "part of the common enterprise" were sufficient to hold them liable for the alleged deceptive sales. *Id.* at 1270.

In *FTC v. Direct Benefits Group, LLC*, the court found common-enterprise liability present where the entity which "operated the payday loan application websites where consumers became enrolled in the discount clubs" of the other entities "played an integral role in the discount club enrollment process," and another entity "supplied employees and operations, administrative, and technological services" to the other entities. 2013 WL 3771322, at *19. Altogether, "[t]he corporate entities worked cooperatively and complemented one another in inducing customers to enroll in the discount club products." *Id.*

In *FTC v. Consumer Health Benefits Ass'n*, the court found that one entity (GTLI) acted as administrator of a medical discount plan by collecting enrollment fees, paying for office space for another entity (CHBA), maintaining bank accounts for other defendants, and responding to consumer complaints regarding deceptive marketing of the at-issue medical discount plan. 2012 WL 1890242, at *2. Three of GTLI's executives sat on the *de facto* board of CHBA and discussed sales strategies, membership goals, and litigation regarding deceptive practices. *Id.*

---

3d at 1257 ("Loyal and LMS were, *for all intents and purposes, the same company*." (emphasis supplied)), *aff'd*, No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9, 2022); *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 366 (S.D.N.Y. 2019) ("Critically, taking the allegations in the Complaint as true, *this business model relied on the entities working together as a unit to carry out the deceptive scheme*, performing various roles that have shifted between entities over time." (emphasis supplied)); *FTC v. HES Merch. Servs. Co.*, No. 12-CV-1618, 2014 WL 6863506, at *6 (M.D. Fla. Nov. 18, 2014) ("Each company played a crucial role in the scheme, and *no company could operate the scheme independently*." (emphasis supplied)), *aff'd*, 652 F. App'x 837 (11th Cir. 2016).

GTLI also "deposited consumer payments for the medical discount plan into an account that it maintained and commingled these funds with funds unrelated to the plan." *Id.* Another entity "provided office space to CHBA and NBC, paid rent and utilities for the office space, shared expenses with CHBA and NBC, provided funding to hire employees and contractors for CHBA and NBC, operated a call center to manage customer service calls, and distributed materials to new members of the medical discount plan." *Id.* A common enterprise existed.

Florida rests its common enterprise argument on the following: Meta operates its businesses primarily through its subsidiaries; Meta employees use shared email systems and Meta's internal divisions and teams work collaboratively; defendants share corporate headquarters and senior executives who exercise control over policy and staffing decisions; the Meta defendants share data; and Meta Payments oversees commerce and fintech across Meta's platforms. (Am. Compl. ¶¶ 15, 25–27, 38, 40, 42–44.) That Meta Payments shares the same corporate headquarters and leadership with the other Meta defendants—whose leadership exercises control over policy decisions common to all Meta entities—supports a finding that these entities acted as a "common enterprise."

That said, the inquiry does not end. Florida does not plausibly allege that or explain how Meta Payments's own conduct contributed to the alleged COPPA or FDUTPA violations. The only specific allegation of relevant conduct is that "Meta Payments manages, secures, and processes payments made through Meta. Meta's financial connection to its users, including advertising, is made through Meta Payments." (*Id.* ¶ 22.) Florida does not indicate how Meta Payments was involved in the design of any allegedly harmful platform features, the alleged concealment of those harms, or the unlawful collection of under-13 users' data. These allegations are insufficient to show that Meta Payments acted with the other Meta defendants as a "common enterprise" with respect to the conduct giving rise to the State's COPPA or FDUTPA claims.

Meta's motion to dismiss Meta Payments from the Amended Complaint is **GRANTED**.

### C. The FDUTPA Claim

Meta moves to dismiss Florida's FDUTPA claim for lack of personal jurisdiction in the FLMD, specifically on whether that court can exercise specific jurisdiction over Meta for this

claim.[10]

Florida's long-arm statute provides that a defendant may be subject to the jurisdiction if the defendant is subject to general or specific personal jurisdiction. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) (discussing Fla. Stat. § 48.193). The exercise of specific jurisdiction over a defendant is consistent with due process when (i) the defendant "'purposefully directed' his activities at residents of the forum," and (ii) "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted). The exercise of personal jurisdiction must comport with "traditional conception[s] of fair play and substantial justice." *Id.* at 464 (alteration in original) (quoting *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 319 (1945)).

### 1. Purposeful Availment

"Purposeful availment" requires a showing that the defendant *targeted* the forum state.[11] A website or social media platform does not purposefully avail itself of a jurisdiction by the mere fact that it is accessible in the jurisdiction, even if the site has binding terms of service with its users. *See, e.g.*, *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020) ("[E]ven though

---

[10] "Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp.*, 368 F.3d 1174, 1180 (9th Cir. 2004). Florida proposed three bases for personal jurisdiction with respect to FDUTPA: (i) Meta Payments' presence in Florida, (ii) pendent jurisdiction, and (iii) specific jurisdiction. First, because the Court has granted Meta's motion to dismiss Meta Payments, that company's presence in Florida cannot serve as a basis for personal jurisdiction under a common-enterprise theory. Second, because the Court has held that the COPPA claim must be dismissed for improper venue, Florida cannot assert pendent jurisdiction. Thus, specific personal jurisdiction is all that remains.

[11] Florida argues that its allegations alternately satisfy the "purposeful availment" inquiry pursuant to the *Calder* "effects test" for intentional torts. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022) (discussing the "two applicable tests," "the effects test and the minimum contacts test," which can satisfy "purposeful availment"). The "effects test" is satisfied where the plaintiff can show "[1] the tort was intentional, [2] aimed at the forum state, and [3] caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* at 1276. *See, e.g.*, *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008) (concerning an alleged infringing and deceptive use of plaintiff's trademark). While the *Calder* "effects test" appears inapposite here with respect to Florida's claims of unfair and deceptive acts and practices, the Court need not decide so decide given its ruling herein.

Marriott's website is interactive, Marriott does not use it to target South Carolina residents in particular."); *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 785 (5th Cir. 2021) ("Merely running a website that is accessible in all 50 states, but that does not specifically target the forum state, is not enough to create the 'minimum contacts' necessary to establish personal jurisdiction in the forum state . . . ."); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318 (5th Cir. 2021) ("If the site is passive—it just posts information that people can see—jurisdiction is unavailable, full stop. But if the site interacts with its visitors, sending *and* receiving information from them, we must then apply our usual tests to determine whether the virtual contacts that give rise to the plaintiff's suit arise from the defendant's purposeful targeting of the forum state." (citation omitted)); *Evans v. Huffington Post.com, Inc.*, No. 19-cv-536, 2022 WL 21320601, at *8 (S.D. Miss. Apr. 27, 2022) ("It is not enough that HuffPost had a contractual relationship with every user in the United States, including its Mississippi visitors."); *Yohananov v. Bris Avrohom of Fair Lawn*, No. 22-cv-283, 2022 WL 3042521, at *4 (M.D. Fla. Aug. 2, 2022) ("[T]here is no indication that the allegedly tortious website was expressly targeted at the State of Florida.").[12]

On the other hand, companies that "continuously and deliberately exploit[]" a market "must reasonably anticipate being haled into court there" for conduct relating to those contacts. *See, e.g.*, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984) (holding that because a magazine "produce[d] a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed"). Social media platforms are subject to the same assessment.

---

[12] Of note, each of these cases presents distinguishable jurisdictional facts. *Fidrych* involved a claim brought in South Carolina district court for alleged tortious harm the plaintiff suffered while at a Marriott-affiliated hotel in Milan, Italy. *See Fidrych*, 952 F.3d at 128. In *Admar*, plaintiff brought suit in Louisiana, a state with which the defendant had simply no contacts other than the fact that a few third-party stores carried its products. *See Admar*, 18 F.4th at 785. *Johnson* and *Evans* were internet libel cases that assessed specific jurisdiction under the *Calder* "effects test" for intentional torts. *See Johnson*, 21 F.4th at 318; *Evans*, 2022 WL 21320601, at *8. *Yohananov* involved claims brought in Florida alleging that the defendant, which operated a summer camp in New Jersey, employed false and deceptive advertising in light of one of defendant's employees insulting comments to the plaintiff's daughter. *See Yohananov*, 2022 WL 3042521, at *1.

In *Del Valle v. Trivago GMBH*, the Eleventh Circuit wrote that "this is not a case of a nonresident defendant merely operating an interactive website that is accessible in Florida. As alleged by the plaintiffs, the Booking Entities and Expedia Entities promoted their websites and the ability to book lodging at the Resorts on their websites through banner ads directed at Florida residents, follow-up direct emails sent to Florida residents who searched for the Resorts or other geographically proximate hotels, and SEO efforts intended to maximize performance on search engine results pages to purposefully solicit business from Florida residents." 56 F.4th 1265, 1276–77 (11th Cir. 2022). These factors, along with the defendants' "intentional conduct"—"alleged trafficking in confiscated properties under Title III of the Helms-Burton Act"—was sufficient to establish purposeful availment. *Id.*

In *uBID, Inc. v. GoDaddy Grp., Inc.*, uBID alleged GoDaddy violated the Anti-Cybersquatting Consumer Protection Act by intentionally registering domain names "confusingly similar to uBID's trademarks and domain names for the purpose of profiting from uBID's marks and exploiting web surfers' confusion." 623 F.3d 421, 423 (7th Cir. 2010). uBID (based in Illinois) brought suit against GoDaddy (based in Arizona) in Illinois. The court held, in short, that GoDaddy was subject to specific personal jurisdiction in Illinois because of GoDaddy's extensive national advertising and customer solicitation which had resulted in hundreds of thousands of sales in Illinois. *Id.* at 427.

The *uBID* court explained that "GoDaddy's way of doing business allows it to avoid the type of physical presence that makes these questions easier when dealing with non-Internet companies that operate on a similar scale. But the fact that GoDaddy can make millions of dollars and recruit hundreds of thousands of customers without the equivalent of International Shoe's sales representatives, Ford's dealerships, or Coca–Cola's distributors is not decisive under the flexible jurisdictional analysis that the Supreme Court has applied consistently. What matters is that GoDaddy purposefully availed itself of the Illinois market . . . ." *Id.* at 429. While "the alleged wrong can fairly be characterized as occurring anywhere the Internet is accessible," "[t]he claim brought by uBID in Illinois arises directly out of GoDaddy's registration of the infringing domain names bought by customers it has solicited in Illinois and many other states." *Id.* at 431.

"The claim bears a sufficient relationship to GoDaddy's business activities in Illinois to expect GoDaddy to defend itself in Illinois without violating the due process clause." *Id.*

To summarize, many internet content providers simply make their content nationally or globally accessible, permitting users from any jurisdiction to access their content. *Johnson* and *Evans*, which involved articles published online by the Huffington Post, exemplify this situation. On the other hand, some online platforms systematically, precisely, and exhaustively target and solicit users in certain states—perhaps, for some platforms, *every* state—in conducting their business. The Seventh Circuit in *uBID v. GoDaddy* found that haling such an enterprise into court in those jurisdictions for conduct relating to that business activity was consistent with traditional notions of fair play and substantial justice. Such is the case with Meta's conduct here.

Meta offers its clients targeted advertising based on individual consumers' locations in the FLMD, which Meta sells to numerous Florida entities (e.g., Walt Disney World, Orlando Magic, etc.), providing those entities with ad measurement reports based on Florida user views. (Am. Compl. ¶¶ 38–40, 43–52.) Framed in light of Florida's claims of unfair and deceptive practices, Florida alleges that Meta addicts children (including those in Florida) to its platforms, collects data on those children (including tracking their location), serves Florida users ads from Florida businesses, and reports back to those Florida businesses on their advertising visibility among Meta's Florida users. "The claim bears a sufficient relationship to [Meta's] business activities in [Florida] to expect [Meta] to defend itself in [Florida] without violating the due process clause." *See uBID*, 623 F.3d at 431.

Thus, the FLMD court's exercise of specific personal jurisdiction is consistent with due process under *Burger King*'s first prong regarding purposeful availment. *See* 471 U.S. at 472. The Court next considers the second prong—whether this litigation results from alleged injuries that "arise out of or relate to" Meta's activities in the forum. *See id.*

**2. "Arise Out of" or "Relate to"**

For a claim to "arise out of" the defendant's contacts with the forum, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"

*Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 262 (2017) (alterations in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). However, even "regularly occurring" activity "in a State do[es] not justify the exercise of jurisdiction over a claim unrelated to" that activity. *Id.* at 264 (quoting *Goodyear*, 564 U.S. at 931 n.6). "What is needed . . . is a connection between the forum and the specific claims at issue." *Id.* at 265.

In *Bristol-Myers Squibb*, the Court held that the plaintiffs' design defect claim did not arise out of or relate to defendant's California contacts. *Id.* at 259. Even though defendant BMS sold Plavix (the at-issue prescription drug) in California, "BMS did not develop Plavix in California, did not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California." *Id.* at 259. While BMS sold 187 million Plavix pills in California and took in more than $900 million from those sales between 2006 and 2012, those figures amounted to "a little over 1 percent of the company's nationwide sales revenue." *Id.*

In *Ford Motor Co. v. Montana Eighth Judicial District Court*, the Supreme Court held that a Montana state court had personal jurisdiction over Ford with respect to a products-liability suit stemming from a car accident. 592 U.S. 351, 355 (2021). Even though Ford argued that "the particular car involved in the crash was not first sold in the forum State, nor was it designed or manufactured there, . . . [w]hen a company like Ford serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Id.* "An automaker regularly marketing a vehicle in a State . . . has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless where it was first sold)." *Id.* at 368 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The Court nonetheless specifically acknowledged that its holding did "not here consider internet transactions, which may raise doctrinal questions of their own." *Id.* at 366 n.4. The Court noted a hypothetical offered at oral argument: "'[A] retired guy in a small town' in Maine 'carves decoys' and uses 'a site on the Internet' to sell them. 'Can he be sued in any state if some harm arises from the decoy?'" *Id.* (citation omitted). The Court

emphasized that "resolving these cases does not also resolve the hypothetical." *Id.*[13]

Here, the conduct underlying Florida's claim of unfair and deceptive acts and practices establishes the requisite "affiliation between the forum and the underlying controversy." *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919). As described above, Florida claims that Meta: falsely and deceptively represented that its social media platforms are safe for children; designed their platforms as to foster compulsive use in children; and developed a business strategy that exploits the compulsive use of these platforms by children residing in Florida by collecting and selling their personal data into an ecosystem of Florida businesses, with whom Meta has deliberately cultivated relationships. (*See, e.g.*, Am. Compl. ¶ 52 (describing how in 2021, Meta's former Chief Operating Officer Sheryl Sandberg "held a roundtable discussion and met with Tampa Bay small business owners . . . highlight[ing] several local Tampa Bay Facebook-fueled success stories").) Meta is not merely alleged to host a website that offers to ship widgets nationwide for interested customers. *Cf. Ford Motor Co.*, 592 U.S. at 366 n.4. Rather, Florida alleges that Meta deployed these unfair and deceptive practices to embed itself within and profitably exploit the Florida consumer marketplace.

Because Meta has purposefully directed its activities at Florida, and because Florida's claim arises out of or relates to Meta's contacts in Florida, the FLMD court can exercise specific personal jurisdiction over Florida's FDUTPA claim consistent with due process. *See Burger King*, 471 U.S. at 472.[14] Meta's motion to dismiss the FDUTPA claim for lack of personal jurisdiction

---

[13] Neither *Bristol-Myers Squibb* nor *Ford Motor Co.* are particularly helpful for either party. *Bristol-Myers* is distinguishable—there, the defendant placed its product into the stream of commerce and the product was then distributed to numerous jurisdictions, and plaintiff presented little to no allegations of jurisdiction-specific targeting and customer solicitation as in the instant allegations. *Ford Motor Co.* explicitly excluded "internet transactions" from its holding.

[14] This holding is consistent with other courts assessing specific personal jurisdiction with respect to attorneys general asserting similar claims of unfair and deceptive acts and practices against social media companies. *See State v. Meta Platforms, Inc.*, No. 23-CV-4453, at 8 (Vt. Super. Ct., July 29, 2024) ("Meta has done more than merely make its product available to the world at large on the internet. . . . [T]he State alleges that Meta has entered into contracts with tens of thousands of Vermonters, collected personal data from them to target advertising to them, adapted the content it provided them based upon that data, and sold the data about Vermonters to

in the FLMD is thus **Denied**.

## IV. CONCLUSION

Defendants' motion to dismiss the State's claims for improper venue, lack of personal jurisdiction, and failure to state a claim is **Granted in Part** and **Denied in Part**.

*First*, the Middle District of Florida is an improper venue for Florida's COPPA claim. Defendants' motion to dismiss is **Granted** as to the State's COPPA claim without prejudice for leave to refile in an appropriate district.

*Second*, defendants' motion to dismiss the Florida's claims against Meta Payments under a common enterprise theory of liability is **Granted** with prejudice for failure to plausibly allege sufficient facts supporting Meta Payments's participation in the alleged unfair and deceptive acts and practices.

*Third*, the Middle District of Florida may exercise specific personal jurisdiction over Florida's FDUTPA claim consistent with due process. Meta's motion to dismiss is **Denied** as to the FDUTPA claim.

Thus, Florida's claims of unfair and deceptive acts and practices under FDUTPA against Meta Platforms, Inc. and Instagram LLC remain in this MDL. Florida may refile its COPPA claim in an appropriate venue.

///

///

///

---

Vermont businesses to target Vermont users."); *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060, at 10 (Utah Dist. Ct., July 15, 2024) ("The Defendants have a significant business presence in Utah, as alleged in the Complaint, to obtain Utah youth as customers, and harvest their data, which Defendants then sell and use to deliver advertisements directed at Utah youth."); *State v. TikTok Inc.*, No. EQCE089810, at 13 (Iowa Dist. Ct. Aug. 26, 2024) ("[D]efendants have purposefully directed their actions at Iowans through their advertising, making TikTok available to Iowans through various online app stores, entrance into ongoing [Terms of Service] contracts with Iowans, and collection of location data from Iowa users."). Copies of these opinions were filed on Florida's docket (No. 23-cv-05885) at Dkt. Nos. 35-1 (Vermont), 35-2 (Utah), and 36-1 (Iowa).

This terminates Dkt. No. 950 in Case No. 22-md-03047; and Dkt. No. 30 in Case No. 23-cv-05885.

**IT IS SO ORDERED.**

Dated: November 12, 2024

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California